UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SAINT FRANCIS HOSPITAL AND MEDICAL
CENTER,                                                        CIVIL CASE No.

     Plaintiff,

v.

HARTFORD HEALTHCARE CORPORATION,
HARTFORD HOSPITAL, HARTFORD
HEALTHCARE MEDICAL GROUP, INC.,
INTEGRATED CARE PARTNERS, LLC,

     Defendants.

## COMPLAINT WITH JURY TRIAL DEMANDED

## INTRODUCTION

1.     This Complaint is being filed by Saint Francis Hospital and Medical Center ("Saint Francis") against Hartford HealthCare Corporation ("Hartford HealthCare") and its subsidiaries to remedy a campaign of exclusion, acquisition and intimidation that has caused serious harm to health care competition and consumers in the Hartford, Connecticut area.

2.     Hartford HealthCare, and in particular Hartford Hospital, provides health care that is higher cost and lesser quality than other hospitals in the Hartford area. In fact, Hartford Hospital's rates are more than 15% higher than any of Saint Francis, UConn Dempsey, Manchester Memorial or Bristol Hospital, all of the other hospitals in the area that are not part of Hartford HealthCare. Saint Francis is graded higher on most quality measures by the federal government. Nevertheless, Hartford HealthCare's anticompetitive practices have allowed it to increase its dominant position in the market and impose higher prices on care that is of lesser quality to area

patients.  Because of its market dominance and anticompetitive conduct, Hartford HealthCare has not faced any competitive pressure to improve its prices or quality.

3.     Over the last four years, Hartford HealthCare (directly and through its defendant subsidiaries) has engaged in the following anticompetitive practices:

      A.     Acquired numerous physician practices;

      B.     Demanded that its acquired (and other) physicians refer all or virtually all their cases to Hartford HealthCare, regardless of whether that is best for their patients, and penalized physicians who do not do so; and

      C.     Threatened and intimidated physicians who do not follow Hartford HealthCare's dictates.

4.     Over the last four years, Hartford HealthCare has also required physicians to exclusively practice through Hartford HealthCare's physician hospital network, Integrated Care Partners ("ICP"), and demanded and obtained exclusivity in the purchase of cutting edge medical equipment, depriving significant portions of the community of the benefits of that equipment. Additionally, Hartford HealthCare and ICP have interfered with managed care plans' use of "tiered" networks, which provide employers and consumers with an opportunity to obtain lower cost, higher quality health care at a preferred rate.

5.     These actions do not involve competition to attract patients based on price and quality. Instead, they prevent such competition, by controlling large numbers of physicians and effectively locking up referrals of their patients. For example, after specialty physician practices at Saint Francis were acquired by Hartford HealthCare, the patient volume seen by these physicians at Saint Francis was reduced by more than 95%. When physician practices are acquired by Hartford HealthCare, other hospitals lose the opportunity to compete for their patients.

2

6.     As a result of its acquisitions of physician practices and other anticompetitive conduct, Hartford HealthCare has substantially increased its hospital market share to dominant levels.  Hartford HealthCare has also achieved a dominant market share in physicians' services in several specialties.  Hartford HealthCare's market shares in hospital services and in physicians' services in the relevant markets significantly exceed the level at which the Department of Justice and Federal Trade Commission find that mergers and acquisitions are likely to maintain or increase market power. At these dominant levels, Hartford HealthCare is in a position to dictate higher prices to health plans, thereby increasing health care costs to health plan members and patients.

7.     Hartford HealthCare's anticompetitive actions were taken, not to compete, but specifically to increase its market dominance and ability to charge higher than competitive rates. It seeks to do so, in significant part, by seeking to foreclose the opportunities to compete for patients by other hospitals in Hartford County, including its most significant competitor, Saint Francis. At meetings, Hartford HealthCare executives have stated repeatedly that their plan was to "crush" or "bury" Saint Francis.  Another executive said that "we don't want Saint Francis in our backyard."  In every case where Hartford HealthCare has acquired a physician practice involving a physician who previously focused his or her patient care at Saint Francis, the physician has shifted all or virtually all of his or her cases to Hartford HealthCare. Serious harm to Saint Francis will cause significant harm throughout the market, because only Saint Francis can provide a serious challenge to Hartford HealthCare's market position.

8.     Hartford HealthCare's anticompetitive actions have harmed Hartford County hospitals, health plan members, patients and consumers and caused substantial damages to Saint Francis.  Saint Francis therefore seeks both damages and a permanent injunction prohibiting Defendants' anticompetitive conduct.

## PARTIES

9.    Plaintiff Saint Francis is a domestic nonprofit corporation organized under the laws of Connecticut. Its principal office is located in the City of Hartford, County of Hartford, and State of Connecticut. The sole member of Saint Francis is Trinity Health Of New England Corporation, Inc.

10.    Defendant Hartford HealthCare is a domestic nonprofit corporation organized under the laws of Connecticut. Its principal office location is located in the City of Hartford, County of Hartford, and State of Connecticut. Hartford HealthCare is the sole member of defendant Hartford Hospital. Hartford HealthCare as used herein will refer collectively to Hartford HealthCare and its subsidiaries, including its defendant subsidiaries set forth below.

11.    Defendant Hartford Hospital ("Hartford Hospital") is a domestic nonprofit corporation organized under the laws of Connecticut. Its principal office location is located in the City of Hartford, County of Hartford, and State of Connecticut. Hartford HealthCare is the sole member of Hartford Hospital.

12.    Defendant Hartford HealthCare Medical Group, Inc., ("Hartford Medical Group") is a domestic nonprofit corporation organized under the laws of Connecticut. Its principal office location is located in the City of Hartford, County of Hartford, and State of Connecticut.

13.    Defendant Integrated Care Partners, LLC ("Integrated Care Partners") is a domestic for profit limited liability corporation organized under the laws of Connecticut. Its principal office location is located in the City of Hartford, County of Hartford, and State of Connecticut. Hartford HealthCare is the sole member of Integrated Care Partners, LLC.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1 and 2. The federal and state law claims set forth herein derive from a common nucleus of operative facts and are such that they should be expected to be all tried in one judicial proceeding.  Accordingly, pursuant to 28 U.S.C. Section 1367(a) the Court has pendent jurisdiction over the Plaintiff's state law claims.

15.     Defendants transact business in the District of Connecticut and are subject to personal jurisdiction therein. The actions complained of herein took place in this district. Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391.

## TRADE AND COMMERCE

16.     Defendants are engaged in interstate commerce and their activities substantially affect interstate commerce. Hundreds of millions of dollars of the revenues of Hartford HealthCare and its Defendant subsidiaries come from sources located outside of Connecticut, including payments from the federal government through such programs as Medicare, and payments from out of state commercial payors such as Anthem and United Healthcare. Hartford HealthCare treats a substantial number of patients from other states and expends millions of dollars on the purchase of supplies in interstate commerce.

17.     Saint Francis also earns millions of dollars of revenues in interstate commerce. These include at least hundreds of thousands of dollars of payments in interstate commerce relating to treatment of patients from outside Connecticut, and treatment of patients whose employers are based outside of Connecticut. Saint Francis obtains millions of dollars in payments from national insurers, such as Anthem and United Healthcare, as well as Medicare. Manchester Memorial Hospital ("Manchester Memorial"), University of Connecticut John Dempsey Hospital ("UConn"), and Bristol Hospital (all hospitals in Hartford County) are equally involved in interstate commerce in the same manner. This is also true in particular for the services provided by Saint Francis, Manchester Memorial, Bristol Hospital and UConn which were affected by

39121839.52

Hartford HealthCare's anticompetitive conduct. Saint Francis also purchases millions of dollars in goods across state lines.

18.     For these reasons, the threatened increase in patient volume and market power of Hartford HealthCare, the shifting of patients from Saint Francis and the other Hartford County hospitals and the weakening of these hospitals described herein will substantially affect the parties' revenues in interstate commerce. Such actions will also substantially affect the flow of patients across state lines and the purchase of supplies in interstate commerce, substantially increasing Hartford HealthCare's volume of patients and interstate purchases, and decreasing the volumes of patients and interstate purchases of Saint Francis and the other Hartford County hospitals. The increase in Hartford HealthCare's prices that will result from these actions will also substantially impact patients, employers and health plans purchasing Hartford HealthCare's services, or previously purchasing Saint Francis services, in interstate commerce.

19.     With the exception of these activities in interstate commerce, Hartford HealthCare, Saint Francis and the other Hartford County hospitals engage in substantial activities (involving hundreds of millions of dollars) in intrastate commerce in Connecticut. All these hospitals (including Hartford HealthCare's hospitals) provide their services primarily to patients in Connecticut. These activities involve hundreds of millions of dollars of services for each of these parties. All these entities employ significant numbers of individuals in Connecticut. As a result, the anticompetitive actions challenged herein will also have (and have had) a substantial impact on intrastate commerce in Connecticut, because they will substantially affect the revenues and purchases of each of the parties hereto.

## THE HOSPITALS IN THE RELEVANT MARKETS

20.     Hartford HealthCare is by far one of the largest health care systems in Connecticut. Hartford HealthCare owns at least seven hospitals, ten surgery centers, seven independent imaging

centers, all or part of three ambulance companies, and a series of urgent care centers. Many of these facilities have been acquired by Hartford HealthCare, thereby eliminating independent competition for its operations. Hartford HealthCare also employs more than 750 physicians, many of whom have become affiliated with Hartford HealthCare through acquisitions of their practices.

21.     The premier hospital in the Hartford HealthCare system is Hartford Hospital. Hartford Hospital has 707 staffed beds, and is by far the largest hospital in Hartford County or in central Connecticut. More than 1200 physicians and dentists are on Hartford Hospital's active medical staff. Hartford HealthCare also owns the Hospital of Central Connecticut, located in New Britain and Southington, also in Hartford County. Between them, these facilities operate more than 900 staffed hospital beds and (before the Covid pandemic) had in excess of 17,000 commercially insured discharges.

22.     Saint Francis Hospital is by far the most significant competitor to Hartford Hospital and (by far) the most significant competitor to Hartford HealthCare in Hartford County. Also located in Hartford, Saint Francis Hospital has 578 staffed beds. Like Hartford Hospital and the Hospital of Central Connecticut, Saint Francis is a full service hospital with a broad range of care, including both basic and highly advanced care. In 2019, Saint Francis had more than 8,000 commercially insured discharges, a little more than half the number at the two local Hartford HealthCare hospitals. Saint Francis offers all or virtually all of the services offered by Hartford HealthCare. Saint Francis does not consider any hospitals outside of Hartford County as significant competitors.

23.     Saint Francis is also by a substantial margin Hartford Hospital's closest competitor and Hartford HealthCare's closest competitor in Hartford County. Hartford Hospital and Saint Francis are only a few miles apart, both of them in the city of Hartford, and they are the only

hospitals in the city of Hartford. Both Hartford Hospital and Saint Francis offer a full range of hospital services, including both basic and sophisticated services. Both hospitals are convenient to physicians and patients in the Hartford metropolitan area.

24.     Saint Francis is substantially less expensive than Hartford Hospital. According to a nationwide 2019 Rand Corporation study, entitled "Nationwide Evaluation of Health Care Prices Paid by Private Health Plans" based on 2014-18 data from self-insured employees, state-based all payor claims databases and health plans,  Saint Francis is 15% less expensive for inpatient care generally, 20% less expensive for outpatient care generally, and 10% less expensive for cardiac care. In fact, according to the Rand study, Hartford Hospital is more expensive not only than Saint Francis but than any other hospital in Hartford county. According to federal data from the Center for Medicare and Medicaid Services ("CMS"), Saint Francis also scored better than Hartford Hospital on 9 of 12 measures of payment and value. Despite its higher prices, Hartford Hospital has been able to maintain and increase its dominant market share.

25.     Saint Francis also provides higher quality care than does Hartford Hospital. It has a Medicare star rating of four versus a rating of three for Hartford Hospital. Among 52 quality of care measures addressed by CMS, Saint Francis was superior in 33 of them and Hartford Hospital only 19 of them.

26.     Saint Francis has been recognized by a wide variety of sources as an outstanding hospital. It is recognized as one of the best regional hospitals for six types of care by U.S. News & World Report. It has received a National Database of Nursing Quality Indicators award for outstanding nursing quality. Health Grades considers it one of America's 100 best hospitals for joint replacement. It has received a "gold plus" recognition for its treatment of heart failure by the American Heart Association. And it is a 4-star rated hospital from the Centers for Medicare &

Medicaid Services. Saint Francis provides the lowest cost, highest quality care of any network in Hartford County.

27.     In addition to Saint Francis and the two Hartford HealthCare hospitals, there are three other acute care hospitals in Hartford County, UConn, Manchester Memorial Hospital and Bristol Hospital. While all these hospitals compete for patients in Hartford County, none of them is able to challenge Hartford HealthCare's dominance. None of them compete significantly for patients in the area around the city of Hartford and its suburbs,

28.     Manchester Memorial is a small hospital with only 157 staffed beds, located in Manchester, Connecticut. Manchester Memorial offers limited services that do not fully compete with Hartford HealthCare. It does not provide advanced cardiac care, open heart surgery, or neurosurgery. It offers very limited neurological services. It has very few orthopedic surgeons practicing at the hospital, and does not offer maternal fetal medicine care. In 2019, Manchester Memorial had around 3,000 commercially insured discharges, less than 20% of the number at the two Hartford HealthCare hospitals.

29.     The limited and basic nature of the care provided at Manchester Memorial is revealed by the fact that its case mix index (a measure of the complexity of cases handled) for non-governmental payors in 2019 was 1.04. This compares to a CMI of 1.52 for Saint Francis in the same category and 1.68 for Hartford Hospital. Thus, the average complexity of the cases at Manchester Memorial is only two-thirds that of the cases at Saint Francis or Hartford Hospital.

30.     Manchester Memorial is owned by Prospect, a for-profit chain which has not made significant investments to improve the hospital or increase its competitiveness. Manchester Memorial also co-owns an ambulance service, ASM, with Hartford HealthCare.

39121839.52

31.     Manchester Memorial does not have the resources to substantially invest in an expansion of its capabilities. Manchester Memorial has suffered a loss (an excess of expenses over revenues) in three of the four years from 2016-2019. The hospital's days of cash on hand have been less than 5 on average throughout those years, as compared to a statewide average of 91 days. Manchester Memorial is not in, and does not compete for patients in, the Hartford metropolitan area.

32.     UConn (which has fewer than 200 staffed hospital beds) is also not significantly competitive with Hartford HealthCare. The hospital has suffered very serious financial losses in recent years. Its medical staff is made up entirely of University of Connecticut medical faculty, who focus significantly on scholarship and research, and spend less time on patient care than do most community physicians. In 2019, UConn had fewer than 3,000 commercially insured discharges, less than 20% of the figure at the two Hartford HealthCare hospitals. UConn has explained in its financial statements that its financial health is adversely affected by its "low reimbursement rate for services provided…" as well as "cost factors resulting from its status as a public entity."

33.     UConn is facing a financial crisis, and is not in a position to vigorously compete with Hartford HealthCare. The administration of Governor Ned Lamont has questioned whether the state can afford to continue subsidizing the hospital, whose expenses have increased by 54% over the last decade. The state has been paying 40% of the health and retirement benefits for UConn Health, an expense that hospitals typically pay themselves. (One problem is that UConn Health's benefit rates are three times that of other area hospitals.)

34.     Many observers have questioned whether this subsidization can or should continue. The Connecticut Senate Minority Leader has stated that "we should never have done the UConn

Health Center hospital. It has come back to haunt us. It has not made money and it is not making money." The Connecticut Mirror concluded that "nearly every aspect of UConn Health is in the red and relying on state aid." In its 2021 budget summary, the Governor's office stated that "the UConn Health Center is in desperate need of additional state support." Yet after a seeking a partner for UConn Health, government officials have concluded that "no other hospitals or organizations presented a suitable plan to team up" with the medical complex.

35.    UConn also treats all state prisoners, which makes it a less attractive site for commercially insured patients.

36.    UConn draws most of its patients from the Farmington Valley, which is west of the Hartford area. It states that its "primary service area covers 12 towns in the greater Farmington area…" As a result, its competition with Hartford HealthCare for patients in the Hartford metropolitan area is very limited.

37.    Bristol Hospital is a small hospital with 112 staffed beds in Bristol, Connecticut. Bristol Hospital draws its patients primarily from the local area of the city of Bristol and towns to the south of Bristol, is not easily accessible by highway for patients in the Hartford metropolitan area, and therefore does not provide significant competition for Hartford HealthCare in the Hartford metropolitan area. It has facilities in Bristol, Plainville, Burlington, Terryville, Wolcott, Southington and New Britain, all in southwestern Hartford County or nearby. Bristol Hospital's website emphasizes "Outstanding Hospital Care, Close to Home," and its most recent Community Needs Assessment refers to it as "the leading health care provider for people who live and work in the Greater Bristol area." It does not engage in significant competitive efforts in other parts of Hartford County, and is not easily accessible to patients in the Hartford area. Bristol Hospital in 2019 had  fewer than 1,700 commercially insured discharges, less than 10% of the volume of the

39121839.52

two Hartford HealthCare hospitals.  Bristol Hospital also offers a limited range of services. For example, it does not provide cardiac surgery, high-end cardiology or high-end cancer care.

38.     Bristol Hospital is marginally profitable and does not have the resources to compete significantly by developing new services, hiring additional physicians, or engaging in substantial marketing or advertising campaigns. Bristol Hospital lost money (operated with a deficiency of revenues or expenses) for three or four years from 2016-2019. The hospital's days of cash on hand were under 20 for 2017-2019 as compared to a statewide average for hospitals of 91 days. Bristol Hospital's volume of discharges has declined in every year since 2016.

39.     Southern New England Health Care Organization ("SoNE") is a clinically integrated provider network. SoNE is owned 50% by Trinity Health Of New England. SoNE works with its providers (including Saint Francis and its employed physicians) to reduce cost and improve the quality of care. SoNE contracts with, among others, commercial insurers to provide health care services to their members. SoNE also acts as an accountable care organization for Medicare patients.

40.     SoNE is an innovative network, attempting to move away from simple "fee for service" pricing towards value pricing, which creates incentives for higher value, lower cost, and better quality care. SoNE offers bundled pricing for spine and total joint surgery, involving a single price for all the professional and facility services involved in these procedures, and is expanding its bundled pricing efforts to include bariatrics, gastrointestinal and cardiac procedures. Bundled prices allow consumers to better understand the total cost of care and to make better and more economical health care choices. SoNE is also working on contracts in which the providers will share in the risk of high health care costs, including some contracts involving a global assumption of risk by the providers. The sharing of risk by providers creates greater incentives for lower cost,

higher quality care. SoNE's goal is to be a disruptive force in a positive manner in improving health care.

## TWO STAGE MODEL OF COMPETITION

41.     Competition among health care providers depends on the relationship between these providers and employers, subscribers, and managed care plans. Employers select managed care plans on behalf of their employees. When managed care plans create networks, their goal is to offer convenient networks for their enrollees. Employees and subscribers prefer to have a choice from a variety of providers in convenient locations, close to home.

42.     Employers generally have two alternative funding mechanisms for purchasing health insurance for their employees. Fully insured employers and their employees pay premiums, co-pays and deductibles in exchange for access to a managed care plan's provider network and for insurance against the cost of future care. Self-insured employers must pay the entirety of their employees' healthcare claims (aside from member cost-sharing, such as deductibles and co-payments), and, as a result, they immediately incur any provider rate increases.

43.     Managed care plans negotiate contracts with hospitals and physicians to create provider networks. Employees pay higher out-of-pocket costs when they see a non-contracted or out-of- network provider. Patients who are insured through a managed care plan therefore have an incentive to choose in-network providers in order to minimize or avoid out-of-pocket expenses, and providers have incentives to participate in managed care plans' networks because that increases their access to patients insured through those organizations.

44.     Competition among health care providers (both physicians and hospitals) occurs in two stages. In the first stage, providers compete to be selected as in-network providers by managed care plans. Managed care plans seek to create provider networks with geographic coverage and a

scope of services sufficient to attract and satisfy individual subscribers as well as employers and their employees.

45.     Providers benefit from in-network status by gaining access to the managed care plan's members as patients. Accordingly, providers compete in this first stage of competition to be selected as "in-network" by healthcare payors.

46.     In the second stage of competition, providers compete with other in-network providers to attract patients. When enrollees sign up to a plan, they almost always choose in-network providers to avoid paying greater "out of network" costs. Managed care plans typically offer multiple in-network providers with similar out of pocket costs, and those providers compete primarily on non-price dimensions in this second stage to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors offer. The exception is in the case of tiered networks, described below. With that exception, patients are insulated against prices paid to providers and generally do not shop around on the basis of price.

47.     Some managed care plans offer "tiered networks," with different financial incentives for patients who choose different providers, or "narrow" networks offering limited numbers of providers. In tiered networks, providers in the preferred tier may be accessed by members with fewer (or no) co-pays or deductibles payable by the member as compared to their payment obligations when they utilize providers in less preferred tiers. Under these circumstances, providers will compete (by offering lower rates) to be in the preferred tier or in the narrow network.

48.     When managed care plans negotiate with providers, the leverage in those negotiations depends on the plan's outside options. A buyer has leverage if it has acceptable alternatives to a seller driving a hard bargain. Therefore, if a managed care plan could drop a

14

provider and still have an attractive network that it could sell to its customers, the managed care plan would have a stronger bargaining position. For these reasons, the fewer alternative providers available to a managed care plan, the more bargaining leverage each of those providers has. Similarly, the larger the market share of a given provider, the more important its presence in a network is to a managed care plan, and the more leverage it has in bargaining for higher reimbursement rates.

49.     Competition between networks of providers is an important competitive activity in Hartford County and in health care generally. Because patients need to access a wide range of providers, including hospitals, physicians in many specialties, outpatient centers, and ancillary facilities, a payor or employer will need to contract with providers in each of these categories to provide a full range of health care services. This can involve very substantial transaction costs if the payor or employer needs to separately make arrangements with each independent provider in each of these categories.

50.     These transaction costs are substantially reduced through the formation of networks of providers, which can contract on behalf of a range of providers. This is especially important for employers, smaller payors and national payors without a substantial presence in Connecticut, for whom these transaction costs will be greater than, for example, for a very large payor like Anthem.

51.     Thus, networks provide an important efficiency-enhancing competitive alternative, especially for self-insured employers, smaller payors and national payors. Any impediment to vigorous network competition will harm overall competition in the markets in which the networks provide services, including each of the relevant markets in this case.

52.     There are a number of networks competing in Hartford County, including, most significantly, ICP and SoNE. SoNE is the primary competitor to ICP.

## HARTFORD HEALTHCARE'S ANTICOMPETITIVE ACTIONS

53.     Hartford HealthCare has engaged in a number of actions intended to suppress competition and maintain and enhance its dominance.  These actions affect Hartford HealthCare's activities statewide, but have had a particular impact in the Hartford metropolitan area and in Hartford County. The actions planned and ultimately taken include the following:

A.     Acquisition of numerous physician practices, including physicians who were practicing at Saint Francis, Bristol and Manchester Memorial as well as independent physicians participating in SoNE.

B.     Threats to numerous independent physicians that if they did not concentrate their referrals on Hartford HealthCare, that Hartford HealthCare would retaliate against them.

C.     Requiring physicians involved in ICP to send the vast majority of their referrals to Hartford HealthCare with financial penalties if they failed to do so.

D.     Successful demands to obtain exclusive access to cutting edge equipment.

E.     Interference with health plans' adoption of tiered networks, reducing competition and consumer choice.

## ACQUISITION OF PHYSICIAN PRACTICES

54.     Among the physicians who have been employed by Hartford HealthCare (through Hartford HealthCare Medical Group and other subsidiaries), and their practices acquired, within the last four years, are the following:

- Peter Byeff (hematology/oncology)
- Brian Byrne (hematology/oncology)
- Jason Chang (hematology/oncology)
- David Hosmer (hematology/oncology)

16

- Joseph Sinning (hematology/oncology)
- Joerg Rathmann (hematology/oncology)
- Patricia DeFusco (oncology)
- Aneesh Tolat (cardiology)
- Sabeena Arora (cardiology)
- Joseph Ingrassia (cardiology)
- Muzibul Chowdhury (cardiology and primary care)
- Marko Lujic (general surgery)
- Vladimir Daoud (general surgery)
- Kimberly A. Caprio (surgical oncology)
- Bret M. Schipper (surgical oncology)
- Niamey Wilson (surgical oncology)
- Maame Dankwah-Quansah (neurology)
- Barry J. Gordon (neurology)
- Arzu Demirci (primary care)
- Saira Rani (primary care)
- Patricia Lampugnale (primary care)
- Ulysses Wu (infectious disease)
- Paul Anthony (infectious disease)
- Ramkumar Sankaran (nephrology)
- Martin Keibel (family medicine)

55.    Among the additional physicians who became exclusively affiliated with ICP, and ended their affiliations with SoNE or its predecessor, within the last four years, are the following:

- Jesse Eisler (orthopedic surgery)
- Michael Aron (orthopedic surgery)
- Steven Selden (orthopedic surgery)
- Neil Lippman (cardiology)
- Shishir Mathur (cardiology)
- Patrick Senatus (neurosurgery)
- Darshan Shah (primary care physician)
- Gayethri Narayanswamy (primary care physician)
- Narinder Maheshwari (primary care physician)

56.    When physicians are employed by Hartford HealthCare, even if there is no formal purchase of a corporation, it is understood that the physicians will bring with them to Hartford HealthCare a substantial portion of their patient base and often, other employees who work with them. For example, when Dr. Ulysses Wu became employed by Hartford HealthCare, another physician and an APRN followed with him.  Hartford HealthCare Medical Group (the Hartford

17

HealthCare entity that employs physicians) typically takes over a physician's lease and staff when it employs the physician.

57.     A very large number of these physicians previously practiced at Saint Francis. As a result of the acquisitions of their practices and Hartford HealthCare's demands regarding physician referrals, these physicians shifted their referrals away from Saint Francis and to Hartford HealthCare.

58.     The physician practices acquired by Hartford HealthCare have involved many physicians with unique practices or unusually large practices. For example, Dr. Chowdhury admitted the most cardiology cases at Saint Francis prior to his acquisition. Dr. Schipper is the only physician in the Hartford area performing HIPEC procedures, involving high temperature chemotherapy. As a result, many of these losses are especially harmful to Saint Francis, and to competition, disproportionate to the numbers of physicians lost.

59.     Hartford HealthCare has also acquired the practices of a number of physicians (not identified above) who have previously practiced at Manchester Memorial, including orthopedic surgeons, cardiologists, and an independent oncology group. As a result, as after other Hartford HealthCare acquisitions, these physicians shifted their referrals to Hartford HealthCare hospitals. These acquisitions have caused harm to Manchester Memorial in particular with regard to its medical oncology program.

60.     In addition, Hartford HealthCare has acquired the practices of a number of primary care physicians (not identified above) practicing in the Bristol area. This has also resulted in a shift of referrals by those physicians to Hartford HealthCare and its physicians. As a result, these acquisitions have increased the market share of Hartford HealthCare (principally in this case, the Hospital of Central Connecticut) and reduced volumes at Bristol Hospital.

61.     As Hartford HealthCare has acquired practices of medical oncologists, it has also acquired their infusion centers, including the equipment they use to provide chemotherapy to patients. This has increased Hartford HealthCare's volume and capacity in the provision of outpatient medical oncology services.

62.     Hartford HealthCare's acquisitions have been aided by its campaign of intimidation. Hartford HealthCare has told some physicians that if they did not agree to join its practice, that Hartford HealthCare would "crush" them. In some cases, Hartford HealthCare executives said more specifically that if the physician did not join Hartford HealthCare, that Hartford HealthCare would recruit a physician to compete specifically against that doctor. In other cases, Hartford HealthCare has threatened specialist physicians with the loss of referrals from its more than 50 employed primary care physicians.

63.     In addition to its acquisition of individual physicians' practices, Hartford HealthCare has acquired two significant cardiology group practices, Middlesex Cardiology (including nine cardiologists) and Cottage Grove Cardiology. While Middlesex Cardiology is not located in Hartford County, because of the limitations in practice at Middlesex Hospital, where this group is traditionally based, Middlesex Cardiology historically referred high-end cardiology cases as well as cardiac surgery cases to Saint Francis. After its acquisition by Hartford HealthCare, the group has instead sent these cases to Hartford HealthCare hospitals.

64.     Hartford HealthCare has recently completed the acquisition of Cottage Grove Cardiology. Cottage Grove represented more than a third of all cardiology cases at Saint Francis. Until this acquisition, this group had previously concentrated its practice at Saint Francis. While a minority of the individual physicians employed by Cottage Grove concluded that they would not join Hartford HealthCare and have become employed by Saint Francis, this acquisition further

19

substantially reduced cardiology patients at Saint Francis. Cottage Grove's patient lists were owned by the practice, and are now controlled by Hartford HealthCare, and the majority of Cottage Grove physicians have become employees of Hartford HealthCare Medical Group.

65.     As with Middlesex Cardiology, the loss of the Cottage Grove physicians cost Saint Francis not only the cases that were handled at Saint Francis by Cottage Grove cardiologists, but also their referrals of cardiac surgery cases. Typically cardiac surgery cases are referred by cardiologists, and these cases will now be concentrated at Hartford HealthCare.

66.     Before these acquisitions, Middlesex Cardiology and Cottage Grove Cardiology (like many of the other physicians whose practices were acquired by Hartford HealthCare) were independent groups that chose to have each patient hospitalized at the facility which they believed was best for the patient. Now that they have been acquired by Hartford HealthCare, their referrals of patients are controlled by their owners. Thus any opportunity for Saint Francis or other Hartford County hospitals to compete for these patients by providing the best quality and low cost care has been effectively eliminated.

67.     Hartford HealthCare's acquisition of the physician practices of cardiologists is especially harmful to Saint Francis and Hartford HealthCare's other hospital competitors. That is because cardiac and cardiac surgery cases are among the most profitable cases for hospitals, and therefore the loss of such cases is especially harmful.

68.     As a result of these actions, Hartford HealthCare Medical Group has grown substantially. In January 2020, Hartford HealthCare stated in a financial disclosure that Hartford HealthCare Medical Group employed 600 physicians. Its current website states that the group encompasses more than 750 physicians, an increase in 150 physicians in only two years. This includes more than 170 primary and specialty care offices throughout the State of Connecticut.

39121839.52

69.     Physicians whose practices were acquired by Hartford HealthCare after working at Saint Francis have informed Saint Francis personnel that they decided to "switch" to Hartford HealthCare because Hartford HealthCare offered financial compensation to them far in excess of what Saint Francis felt that it could lawfully provide consistent with federal regulations concerning fair market value. Hartford HealthCare's offers to these physicians could only be justified by the hospital referrals and related hospital business that these physicians brought to Hartford HealthCare.

70.     Hartford HealthCare is currently seeking to acquire numerous additional physician practices in Hartford County. The pace of acquisitions has increased in the last several years.

## CONTROL OF REFERRALS

71.     ICP is a physician hospital network owned by Hartford HealthCare whose purpose is to enter into contracts with managed care plans at much higher than market rates, and without assuming downside risk or engaging in innovative practices such as bundled pricing or participation in tiered networks. It is able to do so by attracting a critical mass of physicians whose patients then become unavailable to managed care plans from any other source. Since its inception, ICP has had a strategy of engaging in what it calls "transitioning" physicians out of SoNE, or its predecessor Saint Francis Health Care Partners.

72.     ICP's plan involved, first, recruiting substantial numbers of physicians away from SoNE. It did so by offering physicians arrangements that involved no required investment (which meant that the physicians had no stake in the success of the organization), no payment for use of Hartford's electronic health records, and no requirements in contracts that the physician assumes the risk of high costs. This model, which can only work because ICP and Hartford HealthCare are able to impose contracts on managed care plans that do not require the most cost effective care, means that physicians can participate in the ICP network without the need to take the normal risks

21

inherent in a competitive health care market. Thus, Hartford HealthCare effectively attracted the physicians by promising them that they could enjoy some of the fruits of Hartford HealthCare's market power and anticompetitive conduct.

73.     Within the last four years, ICP has implemented what it refers to as a "network engagement" strategy, to ensure that these independent physicians belonging to ICP refer as many cases as possible to Hartford HealthCare specialists, hospitals and other facilities irrespective of quality, cost or competitive issues. Physicians receive scores on their levels of referrals, and receive significant financial incentives (or are paid significantly less) depending upon whether these referrals are kept within the ICP and Hartford HealthCare systems. Physicians are required to explain every referral that does not stay inside the ICP network. The results are reviewed by a performance management committee. Physicians agree to adhere to these procedures in order to remain in ICP. ICP has increased its efforts, and increased its success, in controlling referrals over time.

74.     Physicians who belong to ICP are required to contract through ICP for all contracts that ICP negotiates. Thus, effectively, ICP has an exclusive arrangement with its physician members. ICP controls billing and collection of its physician members with regard to the contracts that ICP negotiates, which effectively represent all of the commercially insured contracts in which those physicians participate.  Thus, in all the relevant markets, all of which relate to commercially insured patients, ICP effectively controls the practices of these physicians. The recruitment of these physicians to ICP are therefore effectively acquisitions of those physicians within the meaning of Section 7 of the Clayton Act.

75.     All these actions by ICP were at the direction of Hartford HealthCare.

76.     Hartford HealthCare employed physicians are also told that they are required to minimize "leakage" of referrals outside of the Hartford HealthCare system, and most refer virtually all their patients to other Hartford HealthCare physicians without regard to the cost or quality of care. This prevents these physicians from making decisions in the best interests of the patient, and increases Hartford HealthCare's power.

77.     Hartford HealthCare has also threatened independent specialists who practice at Hartford HealthCare hospitals in ways which have further enhanced its control of referrals. For example, cardiologists earn a significant portion of their income through handling cases that are "on-call" at hospitals, i.e. cases that come into the hospital emergency room and require a cardiology consult or a cardiologist to read the results of diagnostic studies. Hartford HealthCare has told cardiologists that if they admit substantial numbers of patients to competing hospitals, they will not receive on-call cases. Given Hartford HealthCare's dominant position in cardiology, this is a powerful threat, and has caused many cardiologists to agree to practice exclusively or near exclusively at Hartford HealthCare, even when they would prefer to perform more of their cases at Saint Francis or other area hospitals. Hartford HealthCare has similar leverage over physicians in many other specialties including in particular orthopedic surgeons, general surgeons, neurologists, gastroenterologists and urologists, who may also benefit significantly from such "on call" and emergency cases. Moreover, the prospect of such retaliation in one or more specialties affects the overall referral practices of multispecialty physician groups because they fear retaliation if any of the physicians in these areas refer significantly to competing hospitals. These physicians have therefore acceded to Hartford HealthCare's demands, and most have shifted their practices entirely to Hartford HealthCare.

78.     Physicians who do not refer their cases to Hartford HealthCare facilities and specialists are also threatened with the loss of referrals from Hartford HealthCare employed and ICP primary care physicians and specialists. For example, an executive from one substantial independent practice who met with SoNE about working together later received a phone call from a Hartford HealthCare executive who told him that Hartford HealthCare had learned about the meeting, and that the group would suffer serious consequences if it proceeded to cooperate with SoNE. Physicians across Hartford realize that if they do cooperate with Saint Francis or with SoNE, that they jeopardize any relationship with Hartford HealthCare, including the immediate loss of referrals from Hartford HealthCare. This has caused most specialists to accede to Hartford HealthCare's demands. There have been significant recent shifts of referrals to Hartford HealthCare by, among others, orthopedic surgeons in response to this pressure.

79.     While some hospitals and networks make efforts to keep referrals "in house," other networks do not utilize the substantial incentives and disincentives implemented by Hartford HealthCare, and other hospitals and networks do not couple these efforts to control referrals with the substantial acquisitions of physician practices engaged in by Hartford HealthCare. Nor do other hospitals and networks engage in the threats of retaliation directed at physicians (including independent members of Hartford HealthCare's hospital medical staffs) who decide to refer cases to competing hospitals and physicians.  These efforts have had the combined effect of permitting Hartford HealthCare to control even more referrals, amass a greater market share without regard to cost or quality, and to create powerful incentives for other physicians to affiliate with Hartford HealthCare.

80.     These actions to control referrals and to retaliate against referrals to competitors were not undertaken to preserve quality, since Hartford HealthCare offers lesser quality care than

24

does Saint Francis, and referrals to Saint Francis would only improve quality of care for the patients. They do not represent competition on the merits but instead interfere with the ability of competing hospitals to attract patients and physicians through lower cost, higher quality care.

81.     As a result of Hartford HealthCare's acquisitions of physicians' practices, coupled with its practices relating to the control of physician referrals, virtually all the patients of these physicians have shifted their patronage from the hospitals at which they originally practiced to Hartford HealthCare. For example, after specialty physician practices at Saint Francis listed above were acquired by Hartford HealthCare, the patient volume seen by these physicians at Saint Francis was reduced by more than 95%. This was not a result of a change in physician or patient perceptions of the best location of care, but was solely a reflection of Hartford HealthCare's increasing control of the market. These acquisitions therefore have overcome the ability of competing hospitals to compete effectively on price and quality and thereby subverted the competitive process. Hartford HealthCare's and ICP's threats and pressure relating to referrals have also caused a significant loss of cases at Saint Francis.

82.     This behavior has also had a significant impact on Hartford HealthCare's ability to acquire even more physician practices. As a result, Hartford HealthCare can emphasize to specialty physicians whose practices it wishes to acquire that they will benefit from a pipeline of referrals from Hartford HealthCare's primary care and other physicians.  This is a powerful incentive, since Hartford HealthCare employs, or controls through ICP, almost 80 primary care physicians, who refer cases to a broad range of specialists. Additionally, many other specialty practices acquired by Hartford HealthCare also generate significant numbers of referrals.  For example, medical oncologists and hematologists/oncologists make referrals to radiation oncologists and surgical oncologists.  General surgeons make referrals to medical oncologists.  Cardiologists refer cases to

cardiac surgeons.  Neurologists refer cases to neurosurgeons. As more physician practices have been acquired, and more referrals have been controlled by Hartford HealthCare, the benefits of acquisition by Hartford HealthCare have grown because of the greater number of available referrals to physicians whose practices are acquired. At the same time, practicing independently of Hartford HealthCare has become more difficult, because these referrals are unavailable to physicians who do not practice at Hartford HealthCare.

83.     Since Hartford HealthCare's employed physicians and physicians at ICP overwhelmingly restrict their referrals to physicians practicing at Hartford HealthCare facilities, this creates a strong incentive for independent physicians to practice at those facilities in order to obtain those referrals. This incentive applies not only to the cases referred by Hartford HealthCare and ICP physicians, but to all cases. That is because physicians typically wish to limit the number of hospitals at which they practice in order to more efficiently see patients without the need to travel between hospitals. As a result, the increasing number of referrals available for practice at Hartford HealthCare facilities means that many independent physicians will practice only at those facilities whether or not the patients in question were referred to them by Hartford HealthCare or ICP physicians.

84.     Hartford HealthCare's acquisitions and its actions to control referrals thus have increased its market power, including its ability to maintain and increase unusually high prices for healthcare services, and its ability to acquire more physician practices through network effects. These network effects have enhanced Hartford HealthCare's market power and magnify the anticompetitive effects of its behavior. Additionally, Hartford HealthCare's acquisitions of physicians in particular specialties increases its share in other specialties, because of these referrals

26

across specialties. And all these Hartford HealthCare physicians refer patients for inpatient and outpatient hospital care in Hartford HealthCare facilities.

85.     Saint Francis and other Hartford County hospitals have been unable to replace physicians acquired by Hartford HealthCare on their medical staffs because physicians practicing at Hartford HealthCare face a loss of referrals if they practice at Saint Francis, and as described below, there are significant barriers to entry by new physicians into Hartford County.

86.     Hartford HealthCare's actions in acquiring physician practices and controlling referrals have imposed significant costs on Saint Francis and the other hospitals in the relevant markets in numerous respects. These actions have required the competing hospitals to spend significant resources to attempt to recruit additional physicians to replace the physicians who no longer practice at their hospitals, though, as described below, such recruitment is often very difficult, slow and costly. The loss of patients in connection with Hartford HealthCare's acquisition of physician practices also reduces the volume at Saint Francis and other hospitals in the market and leaves them with less volume to cover their fixed costs. Thus, their average costs per patient are increased. This is highly significant, because fixed costs are a large element of any hospital's costs.

87.     The loss of commercially insured cases is especially impactful to Saint Francis and other hospitals in the relevant markets, because like many hospitals, they depend on commercially insured cases to provide their margin. Medicare and Medicaid cases produce little, if any, margin over cost, and therefore the loss of commercially insured cases is especially harmful to the financial health and ability to compete of a hospital such as Saint Francis.

88.     Hartford HealthCare's actions in acquiring physicians, coupled with the control of referrals and the addition of physicians on exclusive basis at ICP, has also substantially harmed

SoNE, by reducing the breadth of its network. The loss of primary care physicians alone has cost SoNE approximately 10% of its covered lives (members who are insured) in Hartford County. The loss of significant number of specialists also makes SoNE less attractive to members who have utilized those specialists.

89.     SoNE is the only multi-provider network in the relevant markets other than ICP, which is substantially larger than SoNE.  Therefore, efforts by ICP that reduce the volumes in SoNE increase concentration and reduce competition among multi-provider networks.  These efforts have therefore substantially diminished the ability of SoNE to provide a competitive constraint to ICP.  The actions described above have significantly impeded SoNE's ability to compete, and thereby have harmed overall competition among multi-provider networks.

90.     Hartford HealthCare's anticompetitive conduct that is described herein is continuing. It has caused, and, unless enjoined, will continue to cause, significant damage to Saint Francis and the other Hartford County hospitals, and significant anticompetitive effects, harming the competitive process, the state of health care competition in Hartford County, and patients in Hartford County.

## SUPPRESSION OF HEALTH CARE INNOVATION, INCLUDING TIERED NETWORKS

91.     Within the last four years, Hartford HealthCare and ICP have resisted, and thereby suppressed or impeded, innovations in health care that would make it easier for patients to make competitive choices to utilize lower cost providers.

92.     For example, ICP and Hartford HealthCare have rejected requests by the State of Connecticut to adopt contracts with Anthem that would involve "bundled" pricing that could be utilized by state employees. Under bundled pricing, a group of physician and hospital services relating to a specific procedure are offered at one all-inclusive price. Thus, for example, a bundled

28

39121839.52

price with regard to knee surgery would set a rate for knee surgery that included all hospital services and physicians' services necessary for the procedure. Bundled pricing is beneficial to health plans and patients, because it allows them to know the total cost of care for a procedure, and to make informed decisions (including comparisons between facilities) on that basis. If services are not bundled, it is difficult for health plans or patients to compare costs, since they need to look at the separate rates charged by a series of different doctors (e.g. surgeon, anesthesiologist) and for a series of different hospital services (e.g. room rate, operating room rate, rates for imaging procedures). Where comparisons are more easily made, price competition is more effective, and providers face greater pressure to keep prices low.

93.    SoNE has offered a bundled payment program for orthopedic surgery to the State of Connecticut. It is working on developing bundled payments for cardiac procedures as well as gastrointestinal procedures. However, Hartford HealthCare has rejected contracts that involve bundled services. This has stymied the greater competition that bundled pricing can bring. If all providers under a health plan do not offer bundled pricing, the benefits from those services are essentially eliminated, because patients and health plans are unable to compare one bundle to another and to easily determine which care is least costly.

94.    Hartford HealthCare and ICP have also interfered with health plans' utilization of "tiered" networks. As described above, to control escalating healthcare costs, insurers have developed health plans and plan features that provide financial incentives that enable members to achieve savings by choosing lower cost providers. Those incentives thus stimulate price competition between providers

95.    "Tiered" networks are typically created by designating network providers into different levels (or tiers) based mostly on quality and price. Tiered networks typically have two or

more tiers of in-network providers: a preferred tier and one or more secondary in-network tiers. There may also be providers that remain out-of-network. In tiered networks, members are free to use any of the providers, but receive the most substantial savings (e.g. lower copayments or deductibles) when they choose a provider in the preferred tier. This tier typically includes the providers with the best mix of quality and price.

96.     The broader use of tiered networks can be expected to significantly reduce health care costs. One recent study in Health Affairs found that the use of a tiered provider network decreased medical spending by 5%. Anna D. Sinalko, Mary Beth Landrum, and Michael E. Chernew, *Enrollment In A Health Plan With A Tiered Provider Network Deceased Medical Spending By 5 Percent*, Health Affairs 870 (May 2017).  *See also* Scanlon, Dennis P., Richard Lindrooth, and Jon B. Christianson, "*Steering Patients to Safer Hospitals? The Effect of a Tiered Hospital Network on Hospital Admissions*" Health Services Research 43:5, Part II (October 2008); McKinsey Center for U.S. Health System Reform, "*Hospital Networks: Evolution of the Configurations on the 2015 Exchanges*" (premiums 15-23% higher for broad-network plans without tiering); McKinsey Center for U.S. Health System Reform, "*Hospital Networks: Updated National View of Configurations on the Exchanges*" (June 2014).

97.     SoNE has been active in promoting tiered networks or "narrow networks" with payors, which would incentivize members to utilize lower cost, higher quality services, which are provided by SoNE. (Narrow networks typically entirely exclude providers who are unwilling to provide lower rates. Such networks can therefore offer lower prices to employers and their members.)  Narrow networks which exclude Hartford HealthCare have not been at all successful, because Hartford HealthCare is a "must have" system because of its wide range of hospitals and doctors. Hartford HealthCare has refused to participate in narrow networks if they included Saint

Francis or if they required significant discounts in order to obtain the potentially greater volume that a narrow network would provide. The vast majority of members of health plans and their employers would not accept a network that precluded their use of Hartford HealthCare hospitals or physicians.

98.     Tiered networks would avoid this problem, since they would give members an opportunity to use Hartford HealthCare if they desired, though there would be financial incentives to utilize other providers (including SoNE and Saint Francis), if they are lower cost and higher quality. These tiered networks would therefore promote patient choice and competition to provide lower cost, higher quality services.

99.     SoNE has successfully offered tiered networks to a number of area employers, as well as to larger out of area employers with limited numbers of employees in the Hartford area, because such networks reduce cost to result in higher quality care, and can therefore attract more member to plans which offer them. However, the major managed care plans (Aetna, Cigna, United and Anthem) have not offered tiered networks in Hartford County or elsewhere in Connecticut even though each of these firms offers tiered networks in many other locations nationally. That is because Hartford HealthCare has required in its contracts with these payors that they limit or eliminate any use of tiered networks in markets in which Hartford HealthCare operates.

100.    Given Hartford HealthCare's refusal to offer discounts in order to participate in narrow network products, and Hartford HealthCare's suppression of tiered network products, there are no realistic options in the relevant market for employers who wish to obtain health insurance that is at a lower cost than a broad network product that includes essentially all providers. As described above, it is well established in the health care literature that broad networks are higher cost than either narrow network or tiered network products.

31

101.    Through its suppression of tiered networks, as well as its other anticompetitive actions described herein, Hartford HealthCare has insulated itself from the price competition that otherwise would be present in an unfettered free market. As a result, Hartford HealthCare's competitors, including Saint Francis, cannot compete as effectively based on price or quality. In the absence of such suppression, Saint Francis would have attracted substantially more patients.

102.    Hartford HealthCare's suppression of tiered networks has also accentuated its ability to acquire more physician practices and to control more referrals.  If tiered networks were more widely adopted, then Hartford HealthCare would face the risk of losing more patients if it entered into uncompetitive arrangements with physicians at unusually high rates of compensation, which increased its overall costs. The absence of tiered networks allows Hartford HealthCare to pay very high prices to acquired physician practices without concern regarding the effects of those costs on its own rates and competitiveness.

103.    For this reason, and the other reasons set forth below, Hartford HealthCare's suppression of tiered networks complements its acquisition of physician practices and control of referrals. The combination of Hartford HealthCare's physician acquisitions, control of referrals and suppression of tiered networks eliminates any incentives for patients to utilize a lower cost, higher quality network, and therefore effectively insulates Hartford HealthCare from most rate and quality competition. Additionally, the suppression of tiered networks reduces incentives even for those patients who do not have a Hartford HealthCare physician to seek out lower cost, higher quality care.

104.    Hartford HealthCare would not be able to refuse to offer bundled pricing and other innovative rate proposals, and would not be able to insist on anti-tiering provisions in its contracts with health plans, but for its dominant market power, enhanced by its other anticompetitive

practices. Absent that power and those practices, Hartford HealthCare would need to offer innovative pricing in order to be competitive with other hospitals in the market such as Saint Francis.

## EXCLUSIVE USE OF SURGICAL ROBOTS AND OTHER INNOVATIVE EQUIPMENT

105.    Within the last four years, Hartford HealthCare has also demanded, and received, exclusive access to certain innovative medical equipment, thereby suppressing competition involving this equipment and depriving other patients in the area of its use.

106.    An important and growing area of orthopedic practice involves robotic surgery to perform knee and hip replacements. The leading robot used for this practice is the Mako robot.

107.    Hartford HealthCare demanded and obtained a contract that required that a Mako robot could not be sold to either Saint Francis or Yale for the period of time covered by Hartford's purchase agreement. Hartford bought nine different Mako robots over a series of years based on this condition of exclusivity, and this prevented Saint Francis from buying a Mako robot until 2020. Thus, Hartford HealthCare demanded, and received, as many as eight years of exclusivity with regard to the Mako robot.

108.    Hartford HealthCare was able to demand this exclusivity because of its dominant market position, reflecting the fact that it was in a position to perform more volume and therefore purchase more robots.

109.    This exclusivity created a significant handicap for Saint Francis, since alternative surgical robots were not even available in the market until at least 2017, and the Mako robot has remained the clear market leader. Hartford HealthCare heavily promotes the Mako robot on its website, saying that it "offers an unprecedented level of data collection that tells the surgeon, down to a millimeter, how to manipulate the ligament and place implants correctly." Hartford HealthCare

33

also says on its website that the Mako robot "has the potential to revolutionize surgeons' work." Hartford HealthCare also claims that Mako robot-assisted knee surgery reduces hospital stays by 2-4 days, reduces incision length by 4 inches, reduces the period of post-surgical swelling by months and allows a return to driving 4-6 weeks earlier than traditional surgery. Hartford HealthCare markets itself as operating "the Northeast's largest robotic surgery center."

110.    This exclusivity also gave Hartford HealthCare an advantage in acquiring orthopedic physician practices and attracting orthopedic surgeons to ICP and to its medical staff, as well as an advantage in recruitment of orthopedic surgeons, since Hartford HealthCare could tell orthopedic surgeons that they could not utilize a Mako robot unless they practiced at Hartford HealthCare.

111.    Hartford HealthCare's anticompetitive actions (including this exclusivity, its acquisition of the practices of orthopedic surgeons, its referral practices and its suppression of tiered networks) caused a loss of significant orthopedic surgery business at Saint Francis, which has the highest rated orthopedic surgery practice in Hartford County through its Connecticut Joint Replacement Institute ("CJRI").  CJRI is one of the highest rated joint replacement programs in America. Numerous sources, including U.S. News & World Report, Beckers Hospital Review, Health Grades, CMS and CareChex have all ranked Saint Francis' program as one of the top joint replacement programs in the United States. CJRI has also received a grade "A" safety score from the Leapfrog Institute. Nevertheless, Hartford HealthCare has a dominant share in inpatient orthopedic surgery.

112.    Hartford Hospital has attempted to, and obtained, exclusives on other equipment, though the exclusives were not as significant as with regard to the Mako robot. For example, Hartford HealthCare purchased an advanced linear accelerator, and successfully demanded that it

34

be permitted to be the exclusive purchaser of the linear accelerator for a period of six months. This allowed Hartford Hospital to advertise itself for a period of time as the only hospital in the area with this advanced linear accelerator.

113.    By demanding and obtaining these exclusive relationships, Hartford HealthCare has also diminished the opportunities of other hospitals to improve their quality with advanced equipment, and has therefore reduced the quality of care available in the relevant markets. Hartford HealthCare's actions have also subverted the process of quality competition in health care by reducing the availability of innovative equipment to other hospitals.

## RELEVANT MARKETS

114.    Among the relevant product markets applicable to these claims are the market for general adult acute care inpatient hospital services for commercially insured patients. This product market (and the other product markets referenced herein) only apply to services provided to adults. Care for children is often provided by specialized physicians and facilities, and therefore is not a substitute for adult care.

115.    There is no substitute for inpatient services (which generally are defined to include at least one overnight stay in a hospital). Where an overnight stay is medically required, outpatient services are not an acceptable alternative. This market excludes non-acute services such as behavioral health, substance abuse and rehabilitation, because these services are often provided by specialty facilities, often specialized payors purchase these services, and they face different competitive conditions.

116.    This market is a "cluster market", comprised of a number of different services, which do not necessarily substitute for one another. This group of services is typically defined as a cluster market in healthcare antitrust cases for convenience, because, for most purposes, anticompetitive actions by healthcare providers affect the pricing and provision of these services

35

across the board. That is true in this case, because Hartford HealthCare's acquisition of physicians across specialties, the effect of those acquisitions on other specialties due to Hartford HealthCare's control of referrals, the effect of Hartford HealthCare's referral policies on all specialties, and the effect of Hartford HealthCare's suppression of tiered networks, all have impacts that cut across the broad range of hospital services.

117.    In addition to the overall inpatient hospital market, there are separate relevant markets for the provision of particular categories of inpatient and outpatient hospital services, as more fully described below. While some of these services are included within the foregoing overall inpatient hospital "cluster market", they each involve discrete treatments for particular diseases and conditions for which there are no substitutes. As such, they represent separate relevant markets. In each case, these markets are also characterized by high barriers to entry as described below. However, in each case, the anticompetitive effects of Hartford HealthCare's actions differ from those present in the other relevant markets, because the results of Defendants' anticompetitive conduct described above differently affected the provision of services in each of these markets.

118.    The additional relevant markets are as follows:

A.    Hospital inpatient cardiothoracic surgery services ("CT surgery services") offered to commercially insured patients. These services are provided to patients with diseases of the heart, lungs, esophagus, and other organs of the chest, including, among others, coronary artery disease, valvular insufficiency, congestive heart failure, heart attack, aneurysms, and lung cancer. CT surgeries are performed by physicians specializing in cardiothoracic surgery. Typical cardiothoracic surgeries include: coronary

36

artery bypass grafting ("CABG"), mitral and aortic valve repair and replacement, surgical treatment of aortic aneurysms and dissections, implantation of cardiac support devices, and lung and esophageal resection. No other services will substitute for CT surgery, since that surgery is designed to specifically address certain cardiovascular ailments for which surgery is necessary. Hartford HealthCare's acquisitions of cardiologists' practices have had a specific impact on this market, because cardiologists refer cases for cardiac surgery.

B.     Inpatient hospital treatment of oncological disease and disorders offered to commercially insured patients. Oncology services include the diagnosis, and treatment of benign and malignant tumors and other forms of cancer. Hartford HealthCare's acquisitions of the practices of oncologists have had a particular impact on this market, because oncologists perform these services.

C.     Inpatient hospital diagnosis and treatment of orthopedic disorders offered to commercially insured patients. Orthopedic disorders are treated by orthopedic surgeons who specialize in the musculoskeletal system of bones, joints, ligaments, tendons, and muscles. Common orthopedic procedures include joint replacement, spinal fusion, bone fracture repair, soft tissue repair, and arthroscopy. Hartford HealthCare's acquisition of orthopedic surgeons' practices have had a particular impact on this market, because orthopedic surgeons perform these services. Hartford HealthCare's

39121839.52

exclusive access to Mako robots has also had a specific impact on these services, because the Mako robot is used for orthopedic surgical procedures.

D.      Inpatient hospital cardiology services offered to commercially insured patients. These services include hospital management and treatment of cardiovascular conditions, such as arrhythmias, coronary artery disease and myocardial infarction, heart failure, infective endocarditis, aortic and peripheral arterial disease, hypertension, and syncope. This market also includes inpatient cardiac catheterization and ST-Elevation Myocardial Infarction (STEMI) treatment services. These services include cardiac catheterization, and the treatment of heart attacks, including the ST-Elevation Myocardial Infarction (STEMI) heart attacks that may require cardiac catheterization, angioplasty, and stenting. Hartford HealthCare's acquisitions of cardiologists' practices have had a particular impact on this market, because cardiologists perform these services.

E.      Hospital outpatient orthopedic surgical services provided to commercially insured patients. This includes outpatient procedures performed in hospital facilities as well as procedures performed in other hospital-owned facilities. Hartford HealthCare's acquisition of orthopedic surgeons' practices have had a particular impact on this market, because orthopedic surgeons perform these services. Hartford HealthCare's exclusive access to Mako robots has also had a specific impact on these services, because the Mako robot is used for orthopedic surgical procedures.

119.    Some outpatient procedures and services are also provided in non-hospital settings, such as ambulatory surgery centers ("ASC"), imaging centers, and doctors' offices. However, there are important differences between hospital-based outpatient services and outpatient services provided in other settings.

120.    While some patients may choose non-hospital outpatient facilities for outpatient orthopedic care, non-hospital facilities are not a substitute for hospitals for outpatient orthopedic care in health plans' networks. No health plan in Hartford County has excluded hospital outpatient orthopedic services from a network in favor of non-hospital services. This is true for several reasons. Many patients prefer to utilize their hospitals and their facilities for outpatient as well as inpatient services because they know and trust the hospital brand. Additionally, many patients who are elderly or who have other ailments need to have these services provided in a hospital setting so that more extensive backup services such as intensive care units are available if a problem should occur. Physicians located on hospital campuses prefer to refer their patients needing outpatient services to facilities on those campuses for convenience, and often prefer to refer their patients to hospital-owned facilities because they share common electronic medical records with the hospitals. It is also more convenient and efficient for physicians to perform their surgeries, including their outpatient surgeries, at the same locations as their inpatient surgeries. Health plan networks need to include hospital outpatient orthopedic facilities in their networks to appeal to the significant number of patients who prefer those facilities, especially since employers seek networks which satisfy as many of their employees as possible. Therefore, the provision of these outpatient services by non-hospital entities are not a substitute for hospital outpatient services in health plans' networks.

121.    One study found that ASC entry did not have a significant impact on hospitals' outpatient surgical volume, indicating that patients do not see surgeries at ASCs as substitutes for surgeries at hospitals. Another study found that hospitals saw much larger price increases than ASCs for the same outpatient procedures between 2007 and 2012, indicating the differences in the competitive conditions facing ASCs and hospitals even for the same procedures. According to another study outpatient procedures and services delivered in hospitals are often reimbursed at a higher rate than those delivered at a non-hospital setting.

122.    For all these reasons, no health plan in Hartford County would offer a network excluding hospital-owned outpatient orthopedic surgery services, and no significant health plan does so. For example, Anthem, Aetna, Cigna and United all offer hospital outpatient surgery services in their networks. The same is true of the ICP and SoNE networks.

123.    Outpatient medical oncology services provided to commercially insured patients are another relevant market. The outpatient medical oncology services market does not include inpatient hospital services (those requiring an overnight hospital stay). Patients receiving inpatient services do so because either they are too sick to receive care on an outpatient basis or because at least some of the procedures they require are sufficiently serious that an inpatient stay is necessary. As a result, inpatient hospital services are not reasonable substitutes for outpatient medical oncology services.

124.    Another relevant market in this case involves professional adult cardiologist services provided to commercially insured patients.  These services include diagnostic or treatment services by cardiologists who provide non-invasive services (general cardiology), invasive services (including diagnostic cardiac catheterization procedures), interventional cardiology (including placement of stents), and electrophysiology services (including the insertion and/or

removal of devices related to heart rhythm functions).  The duties of a cardiologist vary, but can include management of hypertension, congenital heart diseases and condition, congestive heart failure, arrhythmia (irregular heartbeat), and heart attacks.  For purposes of this Complaint, these services do not include pediatric cardiology services or cardiac surgery.

125.    Significant heart ailments require treatment by a cardiologist.  Cardiologists receive an extended education that includes medical school, a three-year residency in general internal medicine and an additional three years of training in cardiovascular disease medicine. Cardiologists must receive board certification in both internal medicine and cardiology from the American Board of Internal Medicine.  Board certification entails meeting these educational requirements as well as passing a comprehensive examination on the diagnosis and treatment of heart ailments.  No other specialists provide comprehensive or intensive heart care treatment as do cardiologists, and many patients require the services of a cardiologist.

126.    For these reasons, other physicians are not substitutes for adult cardiologists for patients with significant heart ailments.  Because of the significant number of such patients, payors could not offer a successful provider network without including significant numbers of cardiologists in the network.  Every significant payor offering a network in Hartford County, including Aetna, Cigna, United and Anthem, as well as the ICP and SoNE networks, includes cardiologists in its network.

127.    Another relevant product market is the markets for professional medical oncology services to commercially insured patients. These services include the non-surgical hospital management and treatment of cancer by physicians, including inpatient chemotherapy, hormone therapy, immunotherapy, and other targeted therapy for the treatment of cancer, but does not

include professional radiation therapy services. The physicians who provide those services are referred to as radical oncologists, or hematologists/oncologists.

128.    Significant cancer ailments require treatment by a medical oncologist. Medical oncologists receive an extended education that includes medical school, a three-year residency in general internal medicine and an additional two-year fellowship in medical oncology. Medical oncologists Cardiologists can receive board certification in both internal medicine and cardiology from the American Board of Internal Medicine. Board certification entails meeting these educational requirements as well as passing a comprehensive examination on the diagnosis and treatment of cancer. No other specialists provide comprehensive cancer treatment as do medical oncologists, and many patients require the services of a medical oncologist.

129.    For these reasons, other physicians are not substitutes for adult medical oncologists for patients with cancer. Because of the significant number of such patients, payors could not offer a successful provider network without including significant numbers of medical oncologists. Every significant payor offering a network in Hartford County, including Aetna, Cigna, Anthem and United, as well as the ICP and SoNE networks, includes medical oncologists.

130.    All of the product markets described above apply to services promoted to commercially insured patients, because health care services provided to commercially insured patients are in a distinct market from those services when provided to other patients. Most insured consumers of health care are covered either by one of two government insurance programs (Medicare and Medicaid) or by private insurance organizations. The relevant markets do not include services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services. A hospital could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these

programs is limited to the elderly, disabled or underprivileged. Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

131.    Another set of product markets consists of each of the groups of services described above, but provided to Medicare Advantage subscribers, rather than to commercially insured patients. Unlike traditional commercial insurance, Medicare Advantage is only available to individuals who are eligible for Medicare, and therefore is not a substitute for commercial insurance. Medicare Advantage also represents a distinct market from traditional Medicare. Medicare Advantage offers substantial additional benefits as compared to basic Medicare. Studies have found that 80% of the individuals who switch away from a particular Medicare Advantage plan switch to another Medicare Advantage plan rather than to basic Medicare. Academic studies show a distinct preference for Medicare Advantage among its subscribers as compared to traditional Medicare.

132.    Individual providers have no ability to determine the fees that Medicare and Medicaid pay them, and therefore cannot exercise market power with respect to reimbursement by government payers. However, providers negotiate the rates that private insurance companies pay, and they ordinarily charge private payers substantially more than they are paid by either Medicare or Medicaid. Market power can be a factor in these negotiations.

133.    The relevant geographic market for the various product markets defined herein is no larger than Hartford County. Members of health plans within Hartford County and their employers would not accept a health plan network that did not include hospitals and physicians within Hartford County. Hospitals and physicians outside the county are too distant to provide satisfactory alternatives, and most patients would not be willing to travel to those hospitals and

physicians for care. More than 90% of all commercially insured patients in Hartford County and more than 95% of Medicare Advantage patients in Hartford County receive hospital care in the county. No hospital outside of Hartford County receives as much as 3% of the visits of commercially insured patients from Hartford County. The less than 10% who receive care elsewhere include individuals who are hospitalized while on vacation or otherwise traveling away from home. Therefore, no hospitals outside of Hartford County could restrain a price increase or reduction in quality by hospitals in the county.

134.    Patients seek convenient hospital and medical care, and therefore seek to obtain that care close to home. That causes almost all patients who reside in Hartford County to seek their care in Hartford County. Hospitals outside of Hartford County do not actively market themselves to most patients in the County.

135.    For example, patients need, and seek, local cardiology care, especially for emergencies, such as chest pain and heart attacks, which require immediate (and therefore nearby) treatment, and chronic conditions, including heart failure and electrophysiological problems, which require multiple visits, making local convenience very important. Cardiology patients tend to see their cardiologists significantly more frequently than most other patients see their physicians.

136.    As a result, cardiologists locate their offices near where their patients reside, in their home counties. The same is true of other physicians. Hartford HealthCare's Medical Group states on its website that its care "is always available to our patients, close to home."

137.    Patients obtaining medical care for cancer also seek care as close as possible to home. These patients often need repeated treatments, including infusions, over a significant period of time. These treatments often can leave them very weak. Therefore, cancer patients strongly

desire to have their care very close to home so they do not have the added expense and burden of travel added to the already difficult circumstances of their care.

138.    Commercial payors therefore need a broad range of Hartford County hospitals and physicians (in all specialties) in order to attract most employers and subscribers from the Hartford County area. Every payor needs a network of hospitals that would be satisfactory to the vast majority of its members. For that reason, no significant health plan has ever offered a product to Hartford County employers or Hartford County residents that did not include Hartford County hospitals and physicians in its network or that offered better rates for use only of hospitals or any physician specialty outside of the County. This is true of, among others, Anthem, Aetna, Cigna and United HealthCare, the major commercial payors competing in Hartford County. Both ICP and SoNE offer a full range of providers in Hartford County in their networks, including the full range of physician specialties.

139.    In its most recent Community Health Needs Assessment, Hartford Hospital defined its "community" as the Connecticut towns of Bloomfield, East Hartford, Hartford, Newington, Rocky Hill, West Hartford, Wethersfield and Windsor, which it refers to as its hospital service area. All these communities are in central Hartford County, not including the northernmost portion of central Hartford County. In its Community Health Needs Assessment, Hartford Hospital states that the hospitals that are "available in the Hartford Hospital community" are Bristol Hospital, Hartford Hospital, Hospital of Central Connecticut, UConn, Manchester Memorial Hospital and Saint Francis Hospital and Medical Center. The foregoing are the only hospitals in Hartford County.

140.    In its Community Health Needs Assessment, Hospital of Central Connecticut defines its "community" as the cities and towns of Berlin, Bristol, New Britain, Newington,

Plainville, Southington and Wolcott, which it refers to as its hospital service area. These towns and communities are in Southwest and South Central Hartford County. The Hospital of Central Connecticut in its Community Health Needs Assessment identifies the same hospitals discussed in the prior paragraph as those which "are available to address community health needs" in its community.

141. Hartford County is a highly significant area to health plans. It has a population of approximately 900,000, and is the second most populous county in Connecticut. It contains the City of Hartford, which is the state capitol, and one of the most populous cities in the state. A number of major employers are based in Hartford County or have very substantial operations there, including The Hartford, The Travelers Companies Inc., Aetna Inc., Pratt & Whitney, Cigna Corporation and ESPN Inc.  As a result, health plans need to focus significant sales efforts on employers and their members in Hartford County in developing their networks and product offerings.

142. Another relevant geographic market for these services is no larger than the communities of Hartford, West Hartford, East Hartford, Avon, Bloomfield, Farmington, Simsbury, Glastonbury, Rocky Hill, Canton, Windsor, Wethersfield and Newington (the "Hartford Area"). The Hartford Area encompasses all the communities in the Hartford metropolitan area. Employers and consumers in the Hartford Area would not accept a provider network that did not include providers in that area, since most patients prefer to have care close to home. Additionally, as described in more detail above, hospitals in Hartford County outside of the Hartford Area do not actively compete for patients in the Hartford Area, as described above. For these reasons, commercial payors seeking to attract employers and subscribers in the Hartford Area need to offer a network with hospitals in that area. No significant health plan (including Aetna, Cigna, Anthem

and United) has ever offered a product to Hartford Area employers or residents that did not include Hartford Area hospitals and doctors in its network or that offered incentives to use only hospitals and doctors outside of the Hartford Area. Both ICP and SoNE offer hospitals and the full range of physician specialties in the Hartford Area in their networks. The only two hospitals in the Hartford Area are Hartford Hospital and Saint Francis.

143.    Less than 10% of commercially insured patients, and less than 5% of Medicare Advantage patients, who need care in the Hartford Area leave that area for care. Since health plans need to provide convenient networks for the majority of their patients, the fact that most patients do not want to leave the area for care means that a managed care network that wishes to be successful in attracting members and employers in the Hartford Area needs providers in that area.

144.    The Hartford Area is also a highly significant area to health plans. It contains the City of Hartford, which is the state capitol, and one of the most populous cities in the state. A number of major employers are based in the Hartford Area or have very substantial operations there, including The Hartford, The Travelers Companies Inc., Aetna Inc., Pratt & Whitney, Cigna Corporation and ESPN Inc. As a result, health plans need to focus significant sales efforts on employers and their members in the Hartford Area in developing their networks and product offerings.

145.    A managed care plan selling its services to employers in Hartford County could not be successful unless its network included cardiologists and medical oncologists in Hartford County.  Cardiologists located outside the county are not reasonable substitutes because they are more distant from local patients.  Therefore, Hartford County is a relevant geographic market for care by cardiologists and medical oncologists.  Every significant payor offering a network in

Hartford County (including Anthem, Cigna, Aetna and United) includes significant numbers of Hartford County adult cardiologists and medical oncologists in its network, as do ICP and SoNE.

146.    A managed care plan selling its services to employers in the Hartford Area could not be successful unless its network included cardiologists and medical oncologists in the Hartford Area.  Cardiologists located outside the county are not reasonable substitutes because they are more distant from local patients.  Therefore, the Hartford Area is a relevant geographic market for care by cardiologists and medical oncologists.  Every significant payor offering a network in the Hartford Area (including Anthem, Cigna, Aetna and United) includes significant numbers of Hartford Area adult cardiologists and medical oncologists in its network, as do ICP and SoNE.

147.    For each of the foregoing reasons, a hypothetical monopolist in any of the relevant markets described above could profitably impose at least a small but significant price increase, since it would not lose appreciable patient volumes to providers outside of that area. This is the test for market definition under the Department of Justice/Federal Trade Commission Merger Guidelines, which are widely followed by the courts.

## **MONOPOLY POWER**

148.    The Hartford HealthCare hospitals have a greater than 55% share of commercially insured and Medicare Advantage general acute care discharges in Hartford County and a greater than 60% share in the Hartford Area. Hartford HealthCare particularly focuses on commercially insured patients, because those are the more profitable patients. No other hospital has a significant share (10% or more) of commercially insured or Medicare Advantage discharges in this area, except for Saint Francis. These shares, as high as they are, underestimate Hartford HealthCare's dominant market power, given the serious competitive limitations of Manchester Memorial, UConn and Bristol Hospital described above.

149.     Hartford HealthCare has similar shares in the other relevant facility markets, exceeding 60% in the relevant cardiac services markets (exceeding 65% for commercially insured patients in the Hartford Area), equaling approximately 70% in the relevant cardiac surgery markets, equaling approximately 60% in the relevant inpatient orthopedics markets, and exceeding 60% in the relevant inpatient oncology markets (approximately 65% for commercially insured patients). While shares of all outpatient oncology services are not available, from public sources, Hartford HealthCare has a share of approximately 60% of hospital chemotherapy services.

150.     As a result of Hartford HealthCare's consolidation of power in the relevant markets, it has been able for many years to charge prices far above competitive levels. This is reflected in the Rand Corporation data described above. Anthem Health revealed in 2017 that Hartford HealthCare had received rate increases from Anthem over the past seven years compounded at greater than 65%. Nevertheless, because of HHC's large market share and control of a large quantity of physician practices, Anthem has retained it in all of Anthem's significant networks offered to Hartford area employers and members.

151.     Hartford HealthCare Medical Group's share in the commercially insured professional cardiologist services market in Hartford County currently equals approximately 45%. If the cardiologists who are exclusively in ICP are added to this figure, Hartford HealthCare's share is approximately 60%. And if those cardiologists who are exclusively on Hartford HealthCare hospitals' active medical staffs (the physicians, including independent practitioners who regularly practice at the hospitals) are included, the share equals approximately 75%. All these physicians are foreclosed from competition by other hospitals. Physicians who are exclusively on Hartford HealthCare hospitals' active medical staffs are foreclosed from competition by other hospitals, because Hartford HealthCare's threats and the risk of retaliation

49

cause these physicians to refer virtually all of these patients to Hartford HealthCare and its specialists. The same numbers for commercially insured medical oncologists' services are approximately 65%, 65% and greater than 70%, respectively. Hartford HealthCare has exclusively on its active medical staffs similarly high shares of physicians in Hartford County in many other specialties as well: approximately 50% in general surgery, 60% in urology, 71% in neurology, greater than 80% in neurosurgery and 60% in orthopedics.

152.    The same or slightly higher shares apply to all the foregoing specialties in the Hartford Area. The patients of all these physicians (as well as similarly situated physicians in other specialties) are foreclosed to competition by other hospitals.

153.    Hartford HealthCare charges higher prices in part because it has higher costs than Saint Francis or other hospitals in the area.  For example, even after adjusting for the complexity of cases, patients at Hartford Hospital stay in the hospital 10% longer than if they are hospitalized at Saint Francis.  This both increases costs and reduces quality, since longer hospital stays create a risk of possible hospital-acquired infections.  Patients are also unable to return home as quickly as they would like.  Hartford HealthCare is able to maintain its dominant position despite these deficiencies because of its market power and its anticompetitive conduct.

154.    The quality differences between Hartford HealthCare and Saint Francis described above have existed over a substantial number of years, and are reflected in comparisons of CMS data over time. Hartford HealthCare's ability to maintain and increase its market share despite these differences is a further indication of its market power.

## ADDITIONAL ANTICOMPETITIVE EFFECTS

155.    Hartford    HealthCare's    actions    described    above    have    had    significant anticompetitive effects because they have markedly increased its dominant market position in a variety of hospital markets:

156.    As a result of its anticompetitive actions, Hartford HealthCare has significantly increased its market share in the relevant hospital markets to dominant proportions. Hartford HealthCare's share of commercially insured general acute care hospital services in Hartford County have increased from 50% to 55% from 2017 to 2021. In the Hartford Area, this share has increased from 55 to 61%. Hartford HealthCare's share has increased in the commercially insured inpatient cardiology market in Hartford County from 54% to 63% (from 55% to 64% in the Hartford Area). Hartford HealthCare's share has increased in the commercially insured inpatient orthopedics market from 41% to 61%, with a very similar increase in the Hartford Area market. Hartford HealthCare's share in the relevant Medicare Advantage markets have increased by similar or even greater amounts, with share increases from 11 to 20 market share points with one exception (for inpatient cancer services).

157.    While more detailed data is not publically available, Hartford HealthCare's share of chemotherapy among Hartford County hospitals has more than doubled, from 30% to 69%.

158.    Hartford HealthCare's shares are similarly dominant within the Hartford area: For cardiologists, approximately 50% within Hartford HealthCare Medical Group, 70% including ICP and 80% including Hartford Hospital medical staff members. And for medical oncologists, 65%, 65% and 80% respectively.

159.    Saint Francis and the other Hartford County hospitals who have lost physician practices to Hartford HealthCare are unable to replace cases the physicians previously performed at their hospitals. Numerous academic studies have established that patients follow the recommendations of their physicians regarding hospitalization. One survey found that only 15 percent of all health care consumers reported switching physicians in 2011. *See* Deloitte Center for Health Solutions, "2011 Survey of Health Care Consumers in the United States: Key Findings,

Strategic Implications." Available at: http://www.deloitte.com/assets/DcomUnitedStates/Local%

20Assets/Documents/US_CHS_2011ConsumerSurveyinUS_062111.pdf (2011), p. 14. Therefore,

direct marketing to patients cannot offset a hospital's loss of physician practices.

160.    Because physicians prefer to practice at very few hospitals, and focus on the

hospitals nearest their offices so as to be more efficient, there are not significant numbers of

physicians in the market who are not already practicing at Saint Francis or Hartford HealthCare

who are available to practice at Saint Francis.  The physicians already practicing at Hartford

HealthCare would face a significant risk in terms of loss of referrals if they were to shift their

practices to Saint Francis.

161.    This market dominance has enhanced Hartford HealthCare's ability to continue to

charge high prices and refuse to offer (and to impede the development of) innovative health care

in the relevant markets.

162.    Hartford HealthCare's acquisitions of physician practices have increased its ability

to demand higher rates from health plans. That is because the more physicians who are employed

by Hartford HealthCare or who operate exclusively within ICP, the more health plan members

there are whose doctor recommends that they utilize Hartford HealthCare hospitals, and the more

members who would be unhappy if their network did not Hartford HealthCare hospitals. As a

result, with the addition of these physicians, it would be even more difficult for a health plan to

offer networks without Hartford HealthCare hospitals, and therefore more difficult for the plan to

refuse hospital rates proposed by Hartford HealthCare, since such refusal could risk the loss of

Hartford HealthCare in its networks. Every physician added to the Hartford HealthCare network

thereby increases Hartford HealthCare's market power in the relevant hospital markets.

163.    Hartford HealthCare's use of its physician practice acquisitions and control of referrals to shift volume away from other hospitals in the market and increase its market share has also directly enhanced its bargaining power with health plans and its ability to obtain higher rates. It is well established in the healthcare academic literature that in hospital-health plan negotiations, the critical factor for a health plan is its "batna", or best alternative to a negotiated agreement. The poorer the alternatives to a negotiated agreement with Hartford HealthCare (which may require acquiescence in Hartford HealthCare's rate demands), the more likely a health plan is to accept those demands, because its alternatives will be even worse. The lower the volumes possessed by the hospitals that compete with Hartford HealthCare in the relevant markets, and the fewer established physicians who practice at those hospitals, the less attractive these other hospitals will be to health plans as an alternative if a health plan is unable to negotiate an agreement with Hartford HealthCare. As a result, Hartford HealthCare will possess more bargaining leverage. Therefore, higher rates have resulted directly from Hartford HealthCare's growing market share and market power.

164.    Similarly, the more physician practices acquired by Hartford HealthCare, the more difficult it is for managed care plans to refuse the rates that Hartford HealthCare demands for its physicians' services. That is because the larger group of physicians means that there are more members of health plans who utilize Hartford HealthCare physicians, and would therefore be unhappy if those physicians were not included in a health plan's network. Therefore, the cost to health plans of a failure to reach agreement on rates (with the resulting loss of Hartford HealthCare physicians from their networks) has increased.

165.    While different physician specialties typically represent different antitrust markets, because the different kinds of specialists are generally not substitutable for one another, the total

number of physicians employed or otherwise controlled by a hospital system such as Hartford HealthCare increases the hospital's bargaining power with health plans. That is because health plans need to offer a network of hospitals and physicians that is acceptable to their members. The more physicians that are not in a network, the more likely it is that a prospective member will find that physicians important to him or her are not available, and will therefore reject the network. Therefore, the more physicians employed by Hartford HealthCare, no matter what the specialty, the greater bargaining power Hartford HealthCare will possess, because of the greater downside in terms of unhappy members (who could switch health plans) that the health plan will face if it is unable to successfully negotiate an agreement.

166.    Hartford HealthCare's acquisitions of physician practices and additional hospitals throughout the state of Connecticut have also increased its ability to demand higher managed care rates, not only in the locations where it has made these acquisitions, but statewide, including in Hartford County and the Hartford Area. That is because a refusal by a health plan to accept the rates Hartford HealthCare demands for its hospitals or physicians in any part of the state can create a road block to successful contracting with Hartford HealthCare statewide. The more physicians and hospitals Hartford HealthCare owns statewide, the greater the consequences to a health plan of not having Hartford HealthCare hospitals and doctors in its network.

167.    Since Hartford HealthCare has a dominant market share in each of the relevant markets, the significant diminution in volume at Saint Francis, the primary competitor to Hartford HealthCare in these markets, has increased Hartford HealthCare's already dominant market share and thereby harm the overall state of competition in the market.

168.    Additionally, the actions described above have also seriously injured each of the other competitors in one or more of the relevant markets, and have thereby further increased Hartford HealthCare's dominance.

169.    Analysis of the federal Horizontal Merger Guidelines standards also supports the conclusion that Hartford HealthCare's conduct was significantly anticompetitive. The Merger Guidelines measure market concentration (higher market shares) using the Herfindahl-Hirschman Index ("HHI"). The HHI measures the sum of the squares of the market shares of the competitors in a market. Under the Merger Guidelines' HHI test, a merger is presumed likely to create or enhance market power (and presumed illegal) when the post-merger HHI exceeds 2500 points and the merger or acquisition increases the HHI by more than 200 points. The shifts in hospital market share which have taken place as a result of Hartford HealthCare's anticompetitive conduct have resulted in an increase in the HHI in the relevant markets 500 points or more, to HHI levels of more than 3000 to 5000, far above the thresholds in the Guidelines. These numbers reflect the extremely anticompetitive nature and effects of Hartford HealthCare's conduct.

170.    Economic research overwhelmingly shows that high market concentration substantially increases hospital prices. The relevant studies have concluded that when hospital markets become highly concentrated, with few competitors and high market shares, prices generally substantially increase:

A.    A 2011 study examined the effect of hospital market concentration on specific procedures. It found that in concentrated hospital markets, hospitals charged 29% more for cervical fusion, 31% more for lumbar fusion, 45% more for total knee replacement, 49% more for total hip replacement, 50% more for angioplasty, and 56% more for CRM device insertion. James C.

55

Robinson, *Hospital Market Concentration, Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology*, 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

B.   One study from 2009 looked at the effect of hospital mergers and consolidations (and the resulting increase in market concentration) on the prices charged by nearby "rival" non-merging hospitals across the United States from 1989 to 1996. It found that non-merging hospitals increased prices 40 percent in response to hospital mergers. Leemore Dafny, *Estimation and Identification of Merger Effects: An Application to Hospital Mergers*, 52 J. L. & Econ. 523, 544 (2009).

C.   Health Affairs published a 2005 study looking at the effect of hospital consolidation through system acquisition (i.e. a hospital joining a wider hospital system). It found that "managed care prices were higher in system hospitals than in nonsystem hospitals by an average of $103 per day." Alison Evans Cuellar and Paul J. Gertler, *How the Expansion of Hospital Systems has Affected Consumers*, 24(1) HEALTH AFFAIRS 213, 217 (Jan. 2005).

D.   A 2011 study examined the effect of concentrated hospital markets on hospital prices in 2001 and 2004. It concluded that "hospital prices are higher in more concentrated markets." Glenn A. Melnick, Yu-Chu Shen and Vivian Yaling Wu, *The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices*, 30(9) HEALTH AFFAIRS 1728, 1729-31 (2011).

56

E.      Another study of hospital mergers found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, The Impact of Hospital Consolidation—*Update*, Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

F.      A study published in the journal *Medical Care* finds that increases in the concentration of inpatient hospital services are associated with increases in outpatient hospital prices, as well as inpatient hospital prices. Baker LC, Bundorf MK, Kessler DP, *Competition in Outpatient Procedure Markets,* MEDICAL CARE 2019; 57:36-41.

171.    Price increases resulting from higher concentration are passed on to local employers and their employees. Self-insured employers pay the full cost of their employees' health care claims and, as a result, they immediately and directly bear the full burden of higher rates. Fully-insured employers are also inevitably harmed by higher rates, because health plans are forced to pass on at least a portion of hospital rate increases to these customers.

172.    Employers, in turn, pass on their increased health care costs to their employees, in whole or in part. Employees bear these costs in the form of higher premiums, higher co-pays, reduced coverage, and/or restricted services. Some Hartford County residents undoubtedly forego or delay necessary health care services because of the higher costs, and others drop their insurance coverage altogether.

173.    Economic research also reveals that high concentration, and less competition, can result in lesser quality health care. One study found that "the evidence suggests that increasing hospital concentration lowers quality." William B. Vogt and Robert Town, *How has hospital consolidation affected the price and quality of hospital care?*, Robert Wood Johnson Foundation,

THE SYNTHESIS PROJECT 4, 8-9 (Feb. 2006). The 2012 update to the Synthesis Project stated that all of the U.S. studies except for one found that competition improves quality." Martin Gaynor and Robert, *The Impact of Hospital Consolidation*-Update, Robert Wood Johnson Foundation. THE SYNTHESIS PROJECT 4 (June 2012). Other recent studies confirm that greater concentration is associated with lesser quality. Koch TG, Wendling BW, Wilson NE, *Physician Market Structure, Patient Outcomes, and Spending: An Examination of Medicare Beneficiaries*, Health Services Research 2018; 53(5):3549-3568. Gary J. Young, E. David Zepeda, Stephen Flaherty, and Ngoc Thai, *Hospital Employment of Physicians In Massachusetts Is Associated With Inappropriate Diagnostic Imaging*, Health Affairs 40:5 (May 2021) (hospital employment of radiologists resulted in 20% increase in inappropriate use of MRIs). Thus, there is a clear relationship between Hartford HealthCare's dominant market position and its poor quality of care.

174.    Because of Hartford HealthCare's control of physician referrals, and its acquisition of numerous physician practices, Hartford HealthCare physicians (representing a substantial portion of the market) cause their patients to utilize Hartford HealthCare's facilities and services even where those facilities and services are higher cost, lower quality and may result in longer lengths of stay. This is consistent with numerous economic studies. Hartford HealthCare is able to charge higher rates and provide lesser quality healthcare without losing business because of its acquisitions of numerous physician practices and control of their referrals.

175.    The academic literature also makes clear that, the acquisition of physician practices by hospitals with market power increases prices when the hospital has market power:

> A.    One study found that "total per-beneficiary spending was $849 higher" at larger hospital-based physician groups as compared to independent groups.
>
> J. Michael McWilliams et al., *Delivery System Integration and Health Care*

*Spending and Quality for Medicare Beneficiaries*, 173 JAMA INTERNAL MED. 1447, 1451 (June 17, 2013). That study also found that "[patient] readmission rates were highest for [larger] hospital-based groups." *Id.* at 1452.

B.    Another study found that "recent increases in the employment of physicians and acquisition of community-based physician practices by hospitals . . . result[ed] in more and more services being paid at higher hospital outpatient rates." James D. Reschovsky and Chapin White, *Location, Location, Location: Hospital Outpatient Prices Much Higher than Community Settings for Identical Services*, 16 NAT'L INSTITUTE FOR HEALTH CARE REFORM 2 (June 2014). The prices were higher due to "likely large differences in bargaining power" possessed by some hospitals.

C.    Yet another study found that increases in the market share of hospitals that owned physician practices were associated with greater growth rates in inpatient hospital prices. Laurence C. Baker et al., *Vertical Integration: Hospital Ownership of Physician Practices Is Associated with Higher Prices and Spending*, 33 HEALTH AFF. 657 (May 2014).  Another study found the same result with respect to outpatient prices. Neprash, *Association of Financial Integration Between Physicians and Hospitals with Commercial Health Care Prices*, 175 JAMA INTERNAL MED 1932 (2015).

D.    Another study found that prices increased when physicians practices were acquired by hospitals, and these increases were "larger when the acquiring

hospital has a larger share of its inpatient market." Capps, Dranove and Ody, "*The Effect of Hospital Acquisitions of Physician Practices on Prices and Spending*" Journal of Health Economics 59 (2018) 139-152.

176.    Consistent with this literature, Hartford HealthCare's acquisitions coupled with its control of physician referrals interferes with decisions on the merits concerning patient care, quality and price, and for those reasons, as well, are anticompetitive. Referrals to Hartford Hospital result in higher prices to insurers, to self-insured employers, and damage to individual subscribers and employees to the extent of their premiums, copays and deductibles.

177.    Competition is also harmed because Hartford HealthCare's actions have significantly reduced the competitive constraint placed on it by Saint Francis, Hartford HealthCare's closest substitute, and its only substitute in the Hartford area. The reduction of competition between close substitutes is recognized as an important anticompetitive effect by the Horizontal Merger Guidelines.

178.    As a result of the suppression of competition by Saint Francis and other hospitals in Hartford County, Hartford HealthCare has become even more essential for managed care plans seeking to serve companies with employees in Hartford County, because these weakened competitors have become less attractive alternatives to Hartford HealthCare. This has made it even more difficult for health plans to develop an alternative network of hospitals without Hartford HealthCare. This significant change in the negotiating dynamic has given Hartford HealthCare enhanced bargaining clout in contract negotiations and the ability to extract even higher rates for services. Thus, it has increased Hartford HealthCare's already significant monopoly power.

179.    One important trend in improving health care quality and reduction of health care costs involves the shift of many orthopedic surgery cases from an inpatient to an outpatient setting.

The same procedure performed in an outpatient setting is substantially less costly than the same procedure performed on an inpatient basis. One "meta-analysis" of economic studies of healthcare found that when the same surgical procedure was performed on an outpatient rather than an inpatient basis, there were cost savings from 17 to 57%. The difference, of course, is that inpatients require 24-hour care in a hospital. Additionally, when cases can be performed on an outpatient basis, quality is improved, because (for example) the risk of hospital-acquired infections is reduced.

180.    Consistent with this trend, more and more orthopedic cases at Saint Francis have been performed on an outpatient, rather than inpatient basis. Saint Francis' inpatient orthopedic cases have declined dramatically and their (lower cost) outpatient cases have grown.

181.    The same trend has not been followed at Hartford HealthCare. Because of its physician practice acquisitions, control of referrals and suppression of tiered networks as described above, Hartford HealthCare has been able to continue to require that many cases be performed on a higher cost (and more lucrative) inpatient basis. This harms consumers, payors, and the community.

182.    For example, in 2017, both Hartford Hospital and Saint Francis had more inpatient commercially insured orthopedic surgery cases than outpatient cases. By 2020, Saint Francis was performing more than four times as many outpatient commercially insured orthopedic surgery cases as inpatient. On the other hand, Hartford Hospital was still performing more inpatient cases than outpatient cases.

183.    It is apparent from this data that Hartford Hospital had not made any adjustment in its practices to reduce costs and increase patient convenience. This has substantially restricted

output in the relevant market for outpatient orthopedic procedures, while reducing the quality of service and increasing the cost of service in the relevant market for inpatient orthopedic services.

184.    Given the substantial cost and quality advantages of performing many orthopedic procedures on an outpatient basis without an overnight hospital stay, in an ordinary competitive market, Hartford HealthCare would have lost substantial patients to St. Francis and other hospitals who offered these outpatient procedures.  However, because of its anticompetitive conduct (including control of referrals, acquisitions of physician practices, exclusive access to the Mako and suppression of tiered networks), Hartford HealthCare has been able to maintain its volumes of inpatient orthopedic care even while hospitals such as Saint Francis has substantially reduced their inpatient orthopedic volumes in favor of more outpatient cases.  This has cost Saint Francis substantial volumes that it would have obtained if the market had been more competitive, because it would then have been able to gain more business from patients and their referring physicians who could freely choose the lower cost, higher quality outpatient procedures.

185.    There are very few non-hospital owned ambulatory surgery centers providing orthopedic surgery in Hartford County. One of them, Farmington Surgery Center, is currently up for sale, and a majority interest will likely be obtained by either Hartford HealthCare or Saint Francis. Hartford HealthCare has made a practice of acquiring ambulatory surgery centers. It acquired what is now a majority interest in a surgery center in Rocky Hill, now referred to as Hospital of Central Connecticut Surgery Center. These acquisitions have increased Hartford HealthCare's share of the relevant outpatient orthopedic surgery markets. Hartford HealthCare has also acquired additional ambulatory surgery centers outside of Hartford County, including the Glastonbury Surgery Center.

186.    Hartford Health has been aided in its acquisition of ambulatory surgery centers by its market power and the resulting high rates it is able to obtain from managed care plans. Typically when ambulatory surgery centers are acquired, the physicians retain an ownership interest in the center, and therefore have a continued stake in the profitability of the center. Hartford HealthCare has touted its ability to maintain the highest managed care rates as a reason why its offers of acquisition should be accepted, since this will generate more revenues and more profits for the physicians. Thus, Hartford HealthCare's existing market power has caused it to be able to further increase its market power in the relevant outpatient orthopedic surgery markets.

187.    Because of the higher prices and lesser quality at Hartford HealthCare, any shifts in patients away from other hospitals to Hartford HealthCare as a result of Hartford HealthCare's control of the referrals, acquisition of physicians and the other anticompetitive conduct described above results in more patients receiving care that is of lesser quality and higher priced. Similarly, actions which have reduced the ability of patients to intelligently choose higher quality, lower cost hospitals, such as Hartford HealthCare's suppression of the use of tiering by managed care plans, harms competition because it reduces quality and increases price for many of the affected consumers.

188.    Saint Francis currently estimates that in the last four years it has lost thousands of commercially insured inpatient cases due to Defendants' anticompetitive practices. Each of these cases would have earned Saint Francis $15,000 or more in contribution margin. Significant damages have been suffered in each of the relevant hospital markets. Those damages are continuing.

## BARRIERS TO ENTRY

39121839.52

189.     Neither hospital entry nor expansion by any hospital will deter or counteract the anticompetitive effects described herein, for multiple reasons. New hospital entry or significant expansion in any of the relevant markets would not be timely or sufficient. Construction of a new general acute-care hospital would take substantially more than two years from the initial planning stages to opening doors to patients. Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk. Constructing a new hospital requires an extraordinarily large, up-front capital investment, and the pay-off is risky and deferred into the future, which makes it highly unlikely that a new hospital competitor will enter any relevant market.

190.     These barriers to entry also preclude the establishment of additional inpatient services described in the specific specialty relevant markets above, as well as outpatient hospital surgery, since no new entrant could establish those services except as part of a hospital. No entrant has attempted to add these services in Hartford County in many years.

191.     A state-granted Certificate of Need is required to build a new hospital or engage in significant facility expansion of a hospital in Connecticut. It is virtually impossible to obtain a Certificate of Need for a new hospital in Connecticut, given the philosophy of state regulators that there are too many hospitals in the state and that the addition of new hospitals will only add health care costs. No new hospital has been built in Connecticut for more than 20 years, and that most recent CON involved the construction of a replacement hospital, rather than the development of a wholly new hospital. It has been many decades since a new hospital was built in Hartford County.

192.     There are significant additional barriers to expansion into any of the relevant markets. None of these services can be provided on a standalone basis, and therefore the provision of any of them would require construction of an entirely new hospital.

193.    To the extent these services are not provided by the existing hospitals in the relevant markets, none of these hospitals could easily or timely expand into these services. The provision of these services requires sophisticated staff and equipment, and Certificate of Need barriers would apply to the acquisition of the relevant equipment in many cases. Areas of specialty surgery require trained surgical staff to work with the surgeons to provide those services.

194.    There are significant barriers to entry into competition for outpatient ambulatory surgery centers. A Certificate of Need is required for the opening of such a center. Regulatory authorities generally do not permit such centers to open unless there is demonstrated need. Recently, Saint Francis was able to open a new ambulatory surgery center only by closing the commensurate number of operating rooms in its hospital. The state regulators did not see a need to increase the total number of operating rooms.

195.    Most importantly, expansion into one of the relevant markets would require development of a cadre of experienced specialty physicians in the area. Timely and sufficient recruitment of additional physicians in such specialties on a scale sufficient to offset the effect of Defendants' actions is extremely unlikely, for several reasons.

196.    First, there is a nationwide shortage of physicians. Patrick Boyle, *U.S. physician shortage growing*, Association of American Medical Colleges (June 26, 2020), https://www.aamc.org/news-insights/us-physician-shortage-growing. By 2033, the U.S. is expected to "face a shortage of between 54,100 and 139,000 physicians". *Id.* By 2025, a shortage of more than 2,200 oncologists is projected, with the Hartford metropolitan area listed in one study as the seventh most at-risk market. Joanne Finnegan, *Another physician shortage: oncologists*, Fierce Healthcare (October 30, 2019), https://www.fiercehealthcare.com/practices/another-physician-shortage-oncologists. Also by 2025, a shortage of 500 orthopedic surgeons is projected

nationwide, Phillip Miller, *A Shortage of Orthopedic Surgeons is Looming*, Merritt Hawkins, (Nov. 12, 2019), https://www.merritthawkins.com/news-and-insights/blog/healthcare-news-and-trends/A-Shortage-of-Orthopedic-Surgeons-is-Looming/. The Association of American Medical Colleges further projects that by 2025 the U.S. will have a shortage of up to 23,400 surgical specialists, with one of the four "greatest shortages in…general surgery." Julia Haskins, *Desperately seeking surgeons*, Association of American Medical Colleges, (April 26, 2019), https://www.aamc.org/news-insights/desperately-seeking-surgeons. A nationwide shortage of cardiologists is also projected. Joanne Finnegan, *Add cardiologists to the list of doctors in short supply*, Fierce Healthcare, (July 26, 2018), https://www.fiercehealthcare.com/practices/add-cardiologists-to-list-doctors-short-supply.

197.    Second, recruitment of physicians is a slow process, requiring at least six months to a year to successfully recruit an additional physician even where recruitment is possible. Third, it takes several years for any recruited physician to build up a significant practice so that the physician can operate on a successful basis. It has been estimated that over the first three years of employing a physician, hospitals lose approximately $150,000 to $250,000 per physician per year. This loss is explained, in part, by slow ramp-up. A hospital's loss on hiring a general primary care physician who is new to the local area is approximately $150,000 higher than the loss after hiring a "more-established" general primary care physician.

198.    Fourth, it would be especially difficult to recruit new specialty physicians or to employ them profitably at independent practices not focused on Hartford HealthCare's hospitals or employed by non-Hartford HealthCare hospitals in the Hartford area, This is due to the significant pool of physicians who are very unlikely to refer to such specialists because the referring physicians are either employed by Hartford HealthCare, members of ICP, where their

referrals are strictly controlled, or need to predominantly send their referrals to Hartford HealthCare in order to avoid retaliation. Thus, Hartford HealthCare's acquisition of physician practices, threats and control of referrals have increased barriers to entry into the relevant markets. Many other physicians will not switch their referrals to any newly recruited specialists simply because they have established referral relationships with existing specialists and hospitals, and would need a significant incentive to change those relationships. For these reasons, recruitment at the hospitals and practices other than Hartford HealthCare Medical Group or another Hartford HealthCare-affiliated practice would be relatively unattractive to specialty physicians given the large referral base controlled by Hartford HealthCare and therefore not available to such physicians, a problem that has increased as Hartford HealthCare has acquired more physician practices

199.    For these reasons, the successful recruitment of specialists would require the simultaneous recruitment of additional primary care and other physicians to provide the specialists with a referral base. But there is also a nationwide shortage of primary care physicians. *See* Association of American Medical Colleges, "Physician Shortages to Worsen Without Increases in Residency Training," at https://www.aamc.org/download/150584/data/physician_shortages_fact sheet.pdf;  American Medical News, "Physician shortage projected to soar to more than 91,000 in a decade," at http://www.amednews.com/article/20101011/profession/310119958/6/ (predicting a shortage of about 45,000 PCPs); https://www.healthecareers.com/article/recruiting/physician-shortage, and Stephen M. Petterson, et al "Projecting US Primary Care Physician Workforce Needs: 2010-2025," at http://www.annfammed.org/content/10/6/503.abstract; https://members.aa mc.org/eweb/upload/The%20Complexities%20of%20Physician%20Supply.pdf; and https://www .aamc.org/download/100598/data/recentworkforcestudies.pdf. *See* https://www.merritthawkins.

com/uploadedFiles/MerrittHawkins/Pdf/mha2012survpreview.pdf. *See also* https://www.healthe

careers.com/article/recruiting/physician-shortage ("And one role that's becoming increasingly

hard to fill? Physicians – especially primary care physicians.").

200.    Fifth, several of the hospitals in or near the relevant market (Manchester Memorial,

Bristol Hospital and UConn Health) do not have the resources to expand significantly or increase

their competitive efforts.

201.    Sixth, many patients who have established relationships with physicians are

unlikely to switch their patronage to new physicians or new hospitals, unless they are given a

strong reason to do so. Patient loyalty makes it difficult for new entrants, both entrants starting

new practices and incumbents trying to grow their practices by recruiting new physicians from

outside the local market, to ramp up their practices.

202.    Seventh, most independent physician practices are shrinking, and do not have the

resources to recruit additional physicians to their practices.

203.    For these reasons, successful entry or expansion of services in any of the relevant

markets is extremely unlikely.

## **COUNT I**

## **VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION**

204.    Saint Francis restates and realleges the allegations of paragraphs 1 through 203, as

if fully restated herein.

205.    Hartford HealthCare possesses and has possessed monopoly power in the relevant

markets. Hartford HealthCare's actions described above, directly and through its subsidiaries, are

being undertaken in order to maintain and enhance Hartford HealthCare's monopoly power, and,

if not enjoined, threaten to achieve that result. These actions are exclusionary, and constitute

unlawful monopolization of each of the relevant markets in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2.

206.    As a direct and proximate result of Hartford HealthCare's violations of Section 2 of the Sherman Act, Saint Francis has suffered injury to its business and property, and further such injury is threatened if Hartford HealthCare's actions are not enjoined.

207.    The actions of Hartford HealthCare have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

<u>**COUNT II**</u>

<u>**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT – ATTEMPT TO MONOPOLIZE**</u>

208.    Saint Francis restates and realleges the allegations of paragraphs 1 through 203, as if fully restated herein.

209.    By each of its anticompetitive actions described above, Hartford HealthCare has specifically intended to attain monopoly power in the relevant markets. Based on Hartford HealthCare's high market share, the high barriers to entry and other competitive conditions described above, and Hartford HealthCare's anticompetitive actions, there is a dangerous probability that Hartford HealthCare will achieve its goals and attain monopoly power in any of the relevant markets in which it did not already possess monopoly power. Such actions constitute unlawful attempted monopolization of each of the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

210.    As a direct and proximate result of these violations of Section 2 of the Sherman Act, Saint Francis has suffered injury to its business and property, and further such injury is threatened if Hartford HealthCare's actions are not enjoined.

39121839.52

211.    The actions of Hartford HealthCare have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

## COUNT III

## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

212.    Saint Francis restates and realleges the allegations of paragraphs 1 through 203, as if fully restated herein.

213.    The acquisition of physician practices by Hartford HealthCare, affiliations with physicians by ICP, agreements by ICP physicians and independent physicians on Hartford HealthCare hospitals' medical staffs to refer cases predominantly to Hartford HealthCare facilities and physicians and exclusive agreements with suppliers have unreasonably restrained trade in each of the relevant markets, in violation of Section 1 of the Sherman Act.

214.    As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act, Saint Francis suffered injury and damages to its business and property, and further such injury is threatened if Hartford HealthCare's actions are not enjoined.

215.    The actions of Hartford HealthCare have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

## COUNT IV

## VIOLATIONS OF SECTION 7 OF THE CLAYTON ACT

216.    Plaintiffs restate and reallege the allegations of paragraphs 1 through 203 above hereof; as if fully restated herein.

217.    The effect of the physician acquisitions described above has been to lessen competition substantially in interstate trade and commerce in each of the relevant commercially insured markets in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

218.    As a direct and proximate result of Hartford HealthCare's violations of Section 7 of the Clay Act, Saint Francis will suffer irreparable harm and damages to its business and property.

219.    Hartford HealthCare is continuing to acquire physician practices.  These violations, and the anticompetitive effects and the irreparable harm caused thereby, will continue unless enjoined.

## COUNT V

## VIOLATION OF CONNECTICUT ANTITRUST ACT – RESTRAINT OF TRADE

220.    Saint Francis restates and realleges the allegations of paragraphs 1 through 203, and paragraphs 213 through 215, as if fully restated herein.

221.    The foregoing agreements constitute unreasonable restraints of trade in violation of the Connecticut Antitrust Act.

222.    The purpose and effect of these actions was to control and maintain price, control the sale of hospital services, and to coerce and persuade third parties to refuse to deal with Saint Francis and SoNE, all in violation of the Connecticut Antitrust Act.

223.    Saint Francis was injured thereby in its business and property, and further such injury and harm to competition is threatened if not enjoined.

## COUNT VI

## CONNECTICUT ANTITRUST ACT - MONOPOLIZATION

224.    Saint Francis restates and realleges the allegations of paragraphs 1 through 203, and paragraphs 205 through 207, as if fully restated herein.

225.    The foregoing actions constitute monopolization in violation of the Connecticut Antitrust Act.

226.    Saint Francis was injured thereby in its business and property, and further such injury and harm to competition is threatened if not enjoined.

**COUNT VII**

**CONNECTICUT ANTITRUST ACT – ATTEMPTED MONOPOLIZATION**

227.    Saint Francis restates and realleges the allegations of paragraphs 1 through 203, and paragraphs 209 through 211, as if fully restated herein.

228.    The foregoing actions constitute attempted monopolization under the Connecticut Antitrust Act.

229.    Saint Francis was injured thereby in its business and property, and further such injury and harm to competition is threatened if not enjoined.

**COUNT VIII**

**VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT**

230.    Saint Francis restates and realleges the allegations of paragraphs 1 through 203, as if fully restated herein.

231.    The conduct described above constitutes unfair methods of competition and unfair practices in violation of the Connecticut Unfair Trade Practices Act.

232.    This conduct has caused, and is likely to cause in the future, harm to competition and to the competitive process.

233.    This conduct has caused and will continue to cause substantial injury to consumers, and the harm as a result of this conduct is not outweighed by any benefits to consumers or competition.

234.    The foregoing actions caused substantial damage to Saint Francis, and further such damage is threatened if not enjoined.

39121839.52

235.     Defendants' conduct, as described herein, has been willful, consistent and repeated over many years. For these reasons, and given the huge size and financial resources of Hartford HealthCare, substantial punitive damages should be awarded.

## COUNT IX

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

236.     Saint Francis restates and realleges the allegations of paragraphs 1 through 203, as if fully restated herein.

237.     Saint Francis had established business relationships with the physicians and suppliers identified above, as well as with patients of those physicians.

238.     Defendants intentionally interfered with those relationships in order to maintain and increase Hartford HealthCare's monopoly power and to erode the competitive abilities, and attempt to destroy, Saint Francis.

239.     These actions were without any business justification. They involved intimidation and coercion, rather than competition on the merits.

240.     Saint Francis was damaged thereby.

241.     For the reasons set forth above, substantial actual and punitive damages should be awarded.

39121839.52

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays that this Court grant the following relief:

    i.     Permanently enjoin Defendants' anticompetitive conduct described above, including future physician practice acquisitions, and actions taken to control or financially incentivize referrals;

    ii.    Require Defendants to divest any physician practices acquired in 2020 or later;

    iii.   Award Saint Francis three times its damages suffered, as well as punitive damages and reasonable attorneys' fees; and

    iv.   Award such other relief as this Court finds just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Date: January 11, 2022

Respectfully submitted,

/s/ William S. Fish, Jr.
William S. Fish, Jr. (ct24365)
wfish@hinckleyallen.com
Jeffrey J. Mirman (ct05433)
jmirman@hinckleyallen.com
Alexa T. Millinger (ct29800)
amillinger@hinkleyallen.com
Hinckley, Allen & Snyder LLP
20 Church Street
Hartford, CT  06103
Telephone: (860) 725-6200

/s/ David A. Ettinger
David A. Ettinger (P26537)
(*Pro Hac* motion to be filed)
dettinger@honigman.com
Paul L. Fabien (P46727)
(*Pro Hac* motion to be filed)
pfabien@honigman.com
Honigman LLP
660 Woodward Avenue
2290 First National Bldg.
Detroit, MI 48226
Telephone: (313) 465-7368
Fax: (313) 465-7369

74

Nicholas A. Burandt (P84113)
(*Pro Hac* motion to be filed)
nburandt@honigman.com
Honigman LLP
155 N. Wacker Drive
Suite 3100
Chicago, IL 60606-1734
Telephone:  (312) 429-6017
Fax:  (312) 701-9335

*Attorneys for Plaintiff*

39121839.52