**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SAINT FRANCIS HOSPITAL & | ) | 3:22-CV-50 (SVN) |
| MEDICAL CENTER, INC., | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARTFORD HEALTHCARE | ) | February 13, 2023 |
| CORPORATION, HARTFORD | ) | |
| HOSPITAL, HARTFORD | ) | |
| HEALTHCARE MEDICAL GROUP, | ) | |
| INC., and INTEGRATED CARE | ) | |
| PATERNERS, LLC, | ) | |
| *Defendants*. | ) | |

## RULING AND ORDER ON DEFENDANTS' MOTION TO DISMISS

Sarala V. Nagala, United States District Judge.

In this private antitrust action, Plaintiff, Saint Francis Hospital & Medical Center, Inc. ("Saint Francis"), claims that Defendants, Hartford Healthcare Corporation ("HHC") and various affiliates, have unreasonably restrained trade and created a monopoly of adult specialist healthcare services in Hartford County. Saint Francis' operative complaint raises eight federal and state antitrust claims and one state common law claim. Defendants have filed the present motion to dismiss, primarily contending that Saint Francis fails to state plausible antitrust claims because it lacks the particular statutory standing necessary to pursue its antitrust claims and fails to identify actionable anticompetitive conduct. For the following reasons, the Court concludes that Saint Francis has stated plausible federal and state antitrust claims, with the exception of one narrow theory of liability, and a plausible state common law claim. Accordingly, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

# I.  FACTUAL BACKGROUND

## A.  The Parties & the Healthcare Market in Connecticut

The operative complaint contains the following allegations, which are accepted as true for the purpose of this motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Saint Francis is a nonprofit hospital system organized in Connecticut and principally located in Hartford, Connecticut.  First Am. Compl. ("FAC"), ECF No. 33, ¶ 9.  Defendant HHC is also a nonprofit hospital system organized in Connecticut and principally located in Hartford, Connecticut.  *Id.* ¶ 10.  The other Defendants—Hartford Hospital, Hartford HealthCare Medical Group, Inc., and Integrated Care Partners, LLC ("ICP")—are subsidiaries of HHC.  *Id.* ¶¶ 10–13.  HHC is "one of the largest health care systems in Connecticut."  *Id.* ¶ 20.  It owns seven hospitals, ten surgery centers, seven independent imaging services, multiple ambulance companies, and multiple urgent care centers, and it employs more than 750 physicians throughout the state.  *Id.*

The hospitals in the City of Hartford, located only a few miles apart from each other, are Hartford Hospital, HHC's "premier" hospital, and Saint Francis.  *Id.* ¶¶ 21, 23.  More than 1,200 physicians and dentists are on Hartford Hospital's active medical staff, and it has 707 staffed beds.  *Id.* ¶ 21.  Meanwhile, Saint Francis has 578 staffed beds.  *Id.* ¶ 22.  Both hospitals "offer a full range of hospital services, including both basic and sophisticated services."  *Id.* ¶ 23.  Saint Francis, however, is "substantially less expensive than Hartford Hospital."  *Id.* ¶ 24.  One study concluded that Saint Francis is "15% less expensive for inpatient care generally, 20% less expensive for outpatient care generally, and 10% less expensive for cardiac care."  *Id.*  In addition, Saint Francis alleges that it "provides higher quality care than does Hartford Hospital."  *Id.* ¶ 25.

HHC owns two hospitals in Hartford County, Hartford Hospital and the Hospital of Central Connecticut, which together operate more than 900 staffed beds and, at one time, had more than

17,000 patient discharges covered by commercial insurance.[1]  *Id.* ¶ 21.  Saint Francis, by contrast, had more than 8,000 patient discharges covered by commercial insurance in 2019.  *Id.* ¶ 22.  HHC's two hospitals in Hartford County "have a greater than 55% share of commercially insured and Medicare Advantage general acute care discharges in Hartford County and a greater than 60% share in the Harford Area."  *Id.* ¶ 159.  Besides Saint Francis and HHC's two hospitals, there are three other acute care hospitals in Hartford County, all of which are significantly smaller than Saint Francis and HHC's two hospitals.  *Id.* ¶ 27.  Manchester Memorial has only 157 staffed beds, and its "limited services" do not compete with HHC or Saint Francis.  *Id.* ¶ 28.  UConn Health has fewer than 200 staffed beds, and it faces a "financial crisis" arising from its status as a state-subsidized hospital.  *Id.* ¶¶ 32–34.  Bristol Hospital has 112 staffed beds and cannot meaningfully compete with HHC's hospitals or Saint Francis because its location makes it inaccessible for patients from the Hartford metropolitan area.  *Id.* ¶ 37.  None of these hospitals have "a significant share," meaning 10% or more, "of commercially insured or Medicare Advantage discharges in this area."  *Id.* ¶ 159.  Saint Francis alleges that this landscape informs how HHC has been able to amass a significant degree of market power in Hartford County.

### B.  Competition in the Healthcare Industry

Saint Francis alleges certain facts regarding the operation of healthcare industry, which it dubs a "two stage model of competition," that are generally relevant to the present motion.  *Id.* ¶¶ 41–52.  A common practice among employers who purchase commercial health insurance for their employees from an insurer is for the employer to select a managed care plan on behalf of the employees; the insured employees then pay premiums, co-pays, and deductibles in exchange for insurance and access to the managed care plan's provider network.  *Id.* ¶¶ 41–42.  Managed care

---

[1] The FAC does not specify the year in which these hospitals had 17,000 commercially insured discharges.

plans and commercial insurers select hospital systems and physicians to create the provider network available to insureds. *Id.* ¶ 43.

The first level of competition among hospital systems occurs when they "compete to be selected as in-network providers by managed care plans." *Id.* ¶ 44. Providers benefit from in-network status by gaining access to the managed care plan's insureds, who have an incentive to seek treatment from the in-network providers because out-of-network providers require the insured to pay more money out-of-pocket. *Id.* ¶ 45. Managed care plans, however, typically "offer multiple in-network providers with similar out of pocket costs." *Id.* ¶ 46. Thus, the second level of competition among hospital systems occurs when they compete with other in-network providers to attract insureds as patients. *Id.* Because the costs to the insureds are relatively similar, in-network providers "compete primarily on non-price dimensions in this second stage to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors offer." *Id.*

Saint Francis alleges that, out of the various provider networks competing in Hartford County, two are relevant here. The first is ICP, a Defendant in this action and subsidiary of HHC. The second is Southern New England Health Care Organization ("SoNE"), a "clinically integrated provider network" affiliated with Saint Francis. *Id.* ¶ 39. Trinity Health of New England, Saint Francis' owner, owns 50% of SoNE. *Id.* ¶¶ 9, 39. Both ICP and SoNE contract with commercial insurers to provide health care services to insureds through member medical providers and physicians. *See id.* ¶ 39.

### C. HHC's Allegedly Anticompetitive Conduct

Saint Francis alleges that, beginning in 2016, HHC began suppressing competition to maintain dominance in the Hartford County market. *Id.* ¶ 53. Specifically, Saint Francis raises

four categories of conduct by HHC that are allegedly anticompetitive: acquiring physician practices; controlling physicians' referrals; refusing to participate in tiered networking programs; and negotiating an exclusive arrangement for certain medical technology. Saint Francis asserts that, as a result of this conduct, HHC "has been able for many years to charge prices far above competitive levels." *Id.* ¶ 161.

### 1. *HHC Acquires Physician Practices*

Saint Francis alleges that, since 2016, HHC has hired, and acquired the practices of, approximately twenty-six physicians formerly affiliated with Saint Francis. *Id.* ¶ 54. While it appears that some of these physicians were employed by Saint Francis, most were independent and practiced at Saint Francis. *Id.* ¶ 57. Saint Francis further alleges that an additional eight physician practices have ended their affiliation with the SoNE provider network and have become "exclusively affiliated" with ICP. *Id.* ¶ 55. In addition to the combined thirty-four physician practices whose affiliation with Saint Francis and SoNE ended as a result of their acquisition by HHC, a number of other physician practices whose physicians were formerly affiliated with Manchester Memorial and Bristol Hospital have been acquired by HHC, similarly limiting those hospitals' ability to compete with HHC. *Id.* ¶¶ 59–60. HHC has also acquired at least two group practices: Middlesex Cardiology, which previously referred cardiac surgery cases to Saint Francis; and Cottage Grove Cardiology, which previously "concentrated its practice at Saint Francis." *Id.* ¶¶ 63–64. Following the groups' acquisition by HHC, they began referring their cases to HHC, which severely impacts Saint Francis because "cardiac and cardiac surgery cases are among the most profitable cases for hospitals." *Id.* ¶¶ 66–67. All told, Saint Francis alleges that HHC has grown substantially in two years, adding approximately 150 physicians. *Id.* ¶ 68.

Saint Francis alleges that various anticompetitive consequences flowed from HHC acquiring these physician practices. To begin, the physicians who were acquired by HHC generally took "a substantial portion of their patient base" with them to the HHC system. *Id.* ¶ 56. Those physicians then began referring their patients to HHC rather than Saint Francis. *Id.* ¶ 57. The loss of commercially insured patients "is especially harmful to Saint Francis" because commercial insurers reimburse for patient services at a "margin over cost" necessary to support the "financial health" of the hospital system, whereas Medicaid and Medicare typically do not. *Id.* ¶ 92. In addition to the patient base, other employees who work with the acquired physicians, such as their staff and colleagues, tended to follow the physicians to HHC. *Id.* ¶ 56. As a result, Saint Francis has had to "spend significant resources to attempt to recruit additional physicians to replace the physicians who no longer practice" at Saint Francis, although "such recruitment is often very difficult, slow and costly." *Id.* ¶ 91.

In addition, the acquired physicians generally had "unique practices or unusually large practices," so their acquisition by HHC was "especially harmful to Saint Francis." *Id.* ¶ 58. For example, one cardiologist "admitted the most cardiology cases to Saint Francis prior to his acquisition"; another example is a surgical oncologist who is the only physician in the county offering a particular chemotherapy treatment. *Id.* Relatedly, as HHC has acquired oncology practices, "it has also acquired their infusion centers," which has increased HHC's capacity to provide outpatient oncology services and harmed Saint Francis' capacity to provide those services. *Id.* ¶ 61.

Saint Francis alleges that HHC has achieved this large volume of acquisitions in part through a "campaign of intimidation." *Id.* ¶ 62. HHC has allegedly told physicians that, if they did not agree to join HHC's system, HHC "would 'crush' them." *Id.* For example, HHC

threatened to "recruit a physician to compete specifically against" a threatened physician, and it threatened "specialist physicians with the loss of referrals from" HHC-employed primary care physicians.  *Id.*  In addition, physicians who left Saint Francis to work for HHC reported that HHC "offered financial compensation to them far in excess of what Saint Francis felt that it could lawfully provide consistent with federal regulations concerning fair market value."  *Id.* ¶ 69.  Some of these physicians were offered highly compensated medical director positions, in some cases with few or no duties.  *Id.* ¶ 70.

### 2.  *HHC Controls Independent & Employed Physician Referrals*

Saint Francis next alleges that HHC effectively controls both independent physicians participating in its provider network and physicians it employs to ensure that they refer only to HHC-affiliated physicians rather than competitor-affiliated physicians.  Although some hospital systems and provider networks "make efforts to keep referrals 'in house,'" Saint Francis alleges that HHC's efforts are significantly greater, resulting in control over physicians and anticompetitive effects.  *Id.* ¶ 84.

With respect to independent physicians, HHC controls their referrals by luring the independent physicians into HHC's provider network with favorable terms and then requiring referrals to stay in the network.  *Id.* ¶ 73.  Specifically, Defendant ICP, the provider network owned by HHC, recruits independent physicians to participate in its network, rather than in that of SoNE, the provider network partially owned by Saint Francis.  *Id.* ¶ 74.  ICP accomplishes this by offering attractive terms to the physicians made possible by HHC's dominant market power.  *Id.*  Then, ICP ensures that independent physicians in its network refer to other ICP-network or HHC physicians by scoring them on their levels of referrals, tying their financial compensation to referrals, requiring them to "explain every referral that does not stay inside the ICP network," *id.*

¶ 75, and, in some cases, threatening physicians with consequences if they refer patients to other hospitals, *id.* ¶ 80. Thus, ICP effectively "has an exclusive arrangement with its physician members." *Id.* ¶ 76. For example, one orthopedic surgeon desired to move his robotic surgery cases from HHC to Saint Francis, and two HHC executives told him they would "'destroy' him professionally" if he did. *Id.* ¶ 82. When the physician moved his cases to Saint Francis anyway, HHC "retaliated against him in a number of ways, including, among others, terminating him from ICP." *Id.* This "pressure" has caused many specialists, especially orthopedic surgeons, to "agree" to HHC's demands. *Id.* ¶ 83.

With respect to physicians HHC employs, HHC executives have told those physicians "that they are required to minimize 'leakage' of referrals outside of the [HHC] system," and, consequently, most HHC-employed physicians refer their patients to other HHC physicians "without regard to the cost or quality of care." *Id.* ¶ 78. For example, both Saint Francis and Hartford Hospital are Level 1 trauma centers, "qualified to provide the highest level of care to serious trauma victims," but HHC's trauma unit is "often overcrowded, with significant backups before some patients can receive care." *Id.* ¶ 79. Despite this disparity in timely care, HHC's other hospitals "have strict rules that require them to refer all trauma cases to Hartford Hospital and not to Saint Francis." *Id.* As with HHC's large-scale acquisition of physicians and their patient bases, HHC's control over physician referrals has caused Saint Francis to lose commercially insured patient cases. *Id.* ¶ 92.

Combining the physicians who are employed by HHC, those who are independent but exclusively listed on HHC's active medical staffs, and those who are independent but exclusively participate in ICP's provider network, HHC's share in the market for specialist physicians is quite large. For example, Saint Francis alleges that HHC has a market share of approximately 75% of

8

all commercially insured professional cardiology services in Hartford County, 70% of commercially insured professional oncology services, 50% of commercially insured professional general surgery services, 80% of commercially insured professional neurosurgery services, and 60% of commercially insured professional orthopedic services. *Id.* ¶ 162. All these physicians, according to Saint Francis, are unreachable by other hospitals because HHC's threats cause them to refer virtually all of their patients to HHC and its specialists. *Id.*

### 3.   *HHC Hampers Tiered Network Programs*

Third, Saint Francis alleges that HHC and ICP have resisted requests to participate in state programs with commercial insurers that would lower costs and benefit patients. With particular respect to state employees, HHC and ICP have refused to participate in two programs designed to increase competition and reduce costs. First, "bundled pricing" programs permit insureds to compare the total cost of a procedure between facilities and make an informed decision about where to obtain the procedure based on total cost. *Id.* ¶ 97. Although SoNE has offered bundled pricing programs, HHC has rejected contracts with commercial insurers that require bundled pricing. *Id.* ¶ 98. Second, HHC has refused to participate in a state program called "Network of Distinction," in which state employees receive cash incentives to use a distinguished, lower-cost provider for certain procedures. *Id.* ¶ 103. Saint Francis alleges that HHC's refusal to participate in these programs hampers their effectiveness. *Id.* ¶¶ 98, 103.

With respect to both state employees and other commercially insureds, HHC and ICP generally refuse to participate in tiered networks. *Id.* ¶¶ 100–01, 105. As noted above, ordinarily the second level of competition among in-network providers to attract insureds as patients occurs on non-price dimensions, given that the costs to insureds are relatively similar. *Id.* ¶ 46. In a tiered network, however, the managed care plan establishes a "preferred tier" of providers that require

fewer, or no, co-pays or deductibles from the insured, which highly incentivizes the insured to choose those preferred providers.  *Id.* ¶ 47.  Saint Francis alleges that, because tiered networking requires hospital systems to compete among each other to be selected by the managed care plans as preferred providers, tiered networking would "stimulate price competition between providers" and "significantly reduce health care costs."  *Id.* ¶¶ 105, 107 (citing studies).  Although SoNE has successfully offered tiered networks to area employers, the major insurers cannot offer tiered networks in Hartford County because HHC refuses to participate in tiered networking that includes Saint Francis or that requires significant discounts, thus reducing the competitive effect tiered networking could provide.  *Id.* ¶¶ 100, 108, 110.  Saint Francis alleges that HHC would not be able to resist tiered networking "but for its dominant market power, enhanced by its other anticompetitive practices."  *Id.* ¶ 115.  Through its "suppression of tiered networks," Saint Francis alleges, HHC "has insulated itself from the price competition that otherwise would be present in an unfettered free market" and effectively impaired Saint Francis' ability to compete.  *Id.* ¶ 112.

### 4.   *HHC Obtains Exclusive Access to Innovative Equipment*[2]

Saint Francis alleges that HHC has obtained "exclusive access to certain innovative medical equipment, thereby suppressing competition involving this equipment."  *Id.* ¶ 116.  Specifically, orthopedic practices increasingly utilize robotic surgery to perform knee and hip replacements, and the leading robot for these procedures is the Mako robot.  *Id.* ¶¶ 117, 120.  Saint Francis alleges that HHC obtained a contract that prohibited the sale of a Mako robot to Saint Francis or Yale for a period of eight years and, as a result, Saint Francis was not permitted to buy a Mako robot until 2020.  *Id.* ¶ 118.  During the exclusivity contract period, HHC bought nine

---

[2] At oral argument, Saint Francis clarified that the allegations pertaining to the Mako robot do not state an independent theory of antitrust liability.  Rather, those allegations relate to its claims about HHC anticompetitively acquiring physician practices and controlling referrals, insofar as the exclusive Mako robot contract enabled further acquisitions of orthopedic surgeon practices and additional control over orthopedic surgery referrals.

Mako robots. *Id.* HHC "was able to demand this exclusivity because of its dominant market position." *Id.* ¶ 119. Saint Francis further alleges that HHC's exclusive use of this innovative technology assisted HHC's efforts to acquire orthopedic physician practices, hire orthopedic surgeons to its staff, and attract independent orthopedic surgeons to ICP's provider network. *Id.* ¶ 121. Saint Francis' inability to use the technology, and associated loss of orthopedic surgeon physicians and referrals, have "caused a loss of significant orthopedic surgery business at Saint Francis," despite its high rating for orthopedic surgery. *Id.* ¶ 122.

D. <u>In Sum: Anticompetitive Market Effects and Saint Francis' Injury</u>

Saint Francis contends that HHC has obtained monopoly market power because it (1) acquired a significant number of physician practices; (2) utilizes threats and rewards to require both employed physicians and physicians in ICP's provider network to refer patients exclusively to other HHC and ICP-network physicians; (3) rejects programs by the State and commercial insurers, such as tiered networking, that would reduce costs to insureds and increase competition; and (4) benefited from exclusive use of innovative orthopedic surgical technology for eight years. As a result of these practices, HHC has amassed a significant share of the market's specialist physicians, all of whom cannot refer patients to Saint Francis. *Id.* ¶ 162. Saint Francis alleges it has lost thousands of commercially insured patient cases as a result.

In a nutshell, Saint Francis alleges that these actions by HHC are anticompetitive because its market domination has meant managed care plans are unable to refuse the high rates HHC charges for its services. Due to its significant market share of physicians, HHC continues to gain more bargaining leverage with managed care plans, and it becomes more difficult "for managed care plans to refuse the rates that [HHC] demands for its physicians' services" because the plans' insureds would be unhappy if their network did not include HHC. *Id.* ¶¶ 173–75. *See also id.* ¶¶

181, 184 (citing studies for the proposition that "[e]conomic research overwhelmingly shows that high market concentration substantially increases hospital prices" and "can result in lesser quality health care").  Thus, HHC is often selected by managed care plans, despite that it offers lower quality services and higher prices than Saint Francis.

### E.  Procedural History

Saint Francis initiated the present action in January of 2022.  ECF No. 1.  The operative complaint alleges nine counts under federal and state law.  Counts One through Three allege claims for unlawful monopolization, attempt to monopolize, and unlawful restraint on trade in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2.  FAC ¶¶ 216, 220, 224.  Count Four alleges a violation of § 7 of the Clayton Act, 15 U.S.C. § 18.  *Id.* ¶ 228.  Counts Five, Six, and Seven allege claims for unlawful restraint on trade, unlawful monopolization, and attempt to monopolize in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.  Id.* ¶¶ 236, 239.  Count Eight alleges unfair trade practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-100a *et seq.  Id.* ¶ 242.  Finally, Count Nine alleges tortious interference with business relationships.  *Id.* ¶ 249.

Defendants filed the present motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Thereafter, the case was transferred to the undersigned.  The Court held oral argument on the motion.

## II.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted.  When determining whether a complaint states a claim upon which relief can be granted, highly detailed

allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.* In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).

The Court, however, is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678. Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Id.* at 679.[3]

### B. Antitrust Law

The Sherman Act, 15 U.S.C. § 1 *et seq.*, was enacted "to assure customers the benefits of price competition and with the 'central interest' of 'protecting the economic freedom of participants in the relevant market.'" *Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 665–66 (S.D.N.Y. 2002) (quoting *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983)).  The Sherman Act outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize."  15 U.S.C. §§ 1, 2.  The Clayton Act, 15 U.S.C. §§ 12–27, was enacted "to strengthen and clarify the Sherman Act," although the standards of liability under both statutes are largely the same.  *Yankees Ent. & Sports Network, LLC*, 224 F. Supp. 2d at 666.  Together, these statutes prohibit: restraints on trade, 15 U.S.C. §§ 1, 18; monopolization, *id.* §§ 2, 18; and attempted monopolization, *id.*  Successful private plaintiffs can be awarded treble damages and injunctive relief under the Sherman and Clayton Acts.  *Id.* §§ 15, 26.

---

[3] In moving to dismiss the complaint, Defendants ask the Court to consider various facts that purport to contradict allegations of the complaint. *See* ECF No. 43 at 14 n.6.  For example, Defendants note that Hartford Hospital is highly ranked, that Saint Francis is owned by a nationwide healthcare system, and that Saint Francis "has significantly greater financial resources than" HHC.  *Id.* at 15–16.  Defendants are correct that, in considering a motion to dismiss, a court can examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  But Federal Rule of Evidence 201(b) permits a court to take judicial notice of a fact only when it "is not subject to reasonable dispute," either because it "is generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (permitting a district court to consider facts of which judicial notice may be taken under Federal Rule of Evidence 201 when ruling on a motion to dismiss).  Here, the facts supplied by Defendants are subject to reasonable dispute, given that they derive from sources, such as online articles and ratings, whose accuracy can reasonably be questioned.  Defendants do not contend that these facts are "incorporated by reference or otherwise integral to the [c]omplaint."  *See Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016).  Accordingly, the Court will consider only the allegations of the operative complaint, detailed above in relevant part.

The Connecticut Antitrust Act similarly prohibits restraints on trade, monopolization, and attempted monopolization, and claims arising under it are generally governed by the same standards applicable to the federal antitrust statutes.  Conn. Gen. Stat. § 35-44b (instructing state courts considering state antitrust claims to "be guided by" federal courts' interpretations of federal antitrust statutes); *Realty, LLC v. Windemere Rsrv., LLC*, 335 Conn. 174, 185 (2020) (explaining that state courts "follow federal precedent when we interpret the [Connecticut Antitrust Act] unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently" (citations and internal quotation marks omitted)); *Dichello Distribs., Inc. v. Anheuser-Busch, LLC*, No. 3:20-CV-01003 (MPS), 2021 WL 4170681, at *6, *9 (D. Conn. Sept. 14, 2021) (considering federal and state antitrust claims together under the federal standard).

The antitrust statutes' prohibition on monopolization and attempted monopolization targets "the creation of a pernicious market structure . . . in which the 'concentration of power saps the salubrious influence of competition.'" *Yankees Ent. & Sports Network, LLC*, 224 F. Supp. 2d at 666 (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979)). Monopoly power, "also referred to as market power," is "the power to control prices or exclude competition." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97–98 (2d Cir. 1998) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (*du Pont*)).[4]  Further legal principles are set forth below where relevant.

---

[4] To demonstrate a prohibited completed monopolization, "a plaintiff must produce evidence sufficient to prove the defendant: (1) possessed monopoly power in the relevant market; and (2) willfully acquired or maintained that power." *Tops Mkts., Inc.*, 142 F.3d at 97.  To demonstrate a prohibited attempted monopolization, "a plaintiff must prove: (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Id.* at 99–100.  Because attempted monopolization "requires some degree of market power," the defendant's "economic power in the relevant market" is "[c]ritical to deciding the dangerous probability prong."  *Id.* at 100.

Defendants seek dismissal of Saint Francis' federal and state antitrust claims, Counts One

through Eight,[5] for three reasons.  First, Defendants claim that Saint Francis lacks antitrust

standing, a prerequisite for bringing antitrust claims.  Second, Defendants argue that the hiring of

physicians, as alleged by Saint Francis, is not anticompetitive conduct recognized under the

antitrust laws.  Third, Defendants claim that Saint Francis fails to plausibly define the relevant

market.  The Court addresses each argument in turn.

### III.   ANTITRUST STANDING

#### A.   Legal Standard

Defendants primarily contend that Saint Francis lacks antitrust standing to bring its

antitrust claims.  Although the federal antitrust statutes appear to confer a broad private right of

action, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries

that might conceivably be traced to an antitrust violation."  *Associated Gen. Contractors of Cal.,*

*Inc.*, 459 U.S. at 534 (citation and internal quotation mark omitted).  Thus, a private antitrust

plaintiff must demonstrate that it has "antitrust standing."  *IQ Dental Supply, Inc. v. Henry Schein,*

*Inc.*, 924 F.3d 57, 62 (2d Cir. 2019) (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408,

---

[5] The Court considers Saint Francis' federal antitrust claims, Counts One through Four, along with its Connecticut Antitrust Act claims, Counts Five through Seven, under the federal standard.  *See Dichello Distribs., Inc.*, 2021 WL 4170681, at *6, *9.  In addition, the Court considers Saint Francis' CUTPA claim along with its federal and state antitrust claims.  CUTPA generally prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," and it provides that courts interpreting this prohibition "shall be guided by" the federal courts' interpretation of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a)(1). Conn. Gen. Stat. §§ 42-110b(a)–(b).  In turn, the FTCA's prohibition on unfair methods of competition "was designed to supplement and bolster the Sherman Act and the Clayton Act."  *Fed. Trade Comm'n v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394 (1953).  Thus, that statute "overlaps" the scope of the Sherman Act's prohibition on restraints on trade, and courts properly consider Sherman Act and Clayton Act jurisprudence to determine whether a violation of the FTCA has been shown.  *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 114 (2d Cir. 2021) (quoting *Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 763 n.3 (1999)).  In sum, the standards governing an antitrust plaintiff's CUTPA claim alleging unfair competition largely mirror the standards governing federal claims arising under the Sherman and Clayton Acts and state claims arising under the Connecticut Antitrust Act.  *See Roncari Dev. Co. v. GMG Enters., Inc.*, 45 Conn. Supp. 408, 433 (Conn. Super. Ct. 1997) (holding that the plaintiff adequately pleaded a violation of CUTPA for the same reasons that the plaintiff adequately pleaded a violation of the Connecticut Antitrust Act).  As such, the Court here will consider Saint Francis' CUTPA claim in Count Eight along with its claims arising under the federal and state antitrust statutes in Counts One through Seven.

436–37 (2d Cir. 2005)).  *See also Port Dock & Stone Corp. v. Oldcastle N.E., Inc.*, 507 F.3d 117,

121 (2d Cir. 2007) (explaining that antitrust standing "is distinct from constitutional standing").

Antitrust standing is "a threshold, pleading-stage inquiry" and "when a complaint by its terms fails

to establish this requirement," the Court "must dismiss it as a matter of law."  *Gatt Commc'ns, Inc.*

*v. PMC Assocs., LLC*, 711 F.3d 68, 75 (2d Cir. 2013) (citation and internal quotation marks

omitted).  "To satisfy antitrust standing at the pleading stage a plaintiff must plausibly allege two

things: (1) that it suffered a special kind of antitrust injury, and (2) that it is a suitable plaintiff to

pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws."  *IQ*

*Dental Supply, Inc.*, 924 F.3d at 62 (quoting *Gatt Commc'ns, Inc.*, 711 F.3d at 76).

     The first element of antitrust standing requires the plaintiff to have suffered an antitrust

injury, which is an "injury of the type the antitrust laws were intended to prevent and that flows

from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,

429 U.S. 477, 489 (1977); *see also Gatt Commc'ns, Inc.*, 711 F.3d at 76 ("The requirement that

plaintiffs demonstrate antitrust injury when bringing a private antitrust action ensures that the harm

claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in

the first place." (quoting *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 342 (1990))).  In

other words, the antitrust injury requirement ensures that a plaintiff can recover only if their loss

"stems from a competition-*reducing*" effect of the defendant's behavior, and not from a

competition-increasing or competition-neutral effect.  *Atl. Richfield Co.*, 496 U.S. at 344 (emphasis

in original).  The Second Circuit has established a three-step test for determining whether a plaintiff

has alleged an antitrust injury:  first, "the court must identify the practice complained of and the

reasons such a practice is or might be anticompetitive"; second, "the court must identify the actual

injury the plaintiff alleges"; and third, "the court compares the anticompetitive effect of the specific

practice at issue to the actual injury the plaintiff alleges." *IQ Dental Supply, Inc.*, 924 F.3d at 62–63 (citing, among others, *Gatt Commc'ns, Inc.*, 711 F.3d at 76).

The second element of antitrust standing requires the plaintiff to be an "efficient enforcer" of the antitrust laws. *Gatt Commc'ns, Inc.*, 711 F.3d at 78. In other words, this element asks "whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 535 n.31. "An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but 'despite the broad wording of [the antitrust laws] there is a point beyond which the wrongdoer should not be held liable.'" *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476 (1982) (quoting *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 760 (1977) (Brennan, J., dissenting)). A four-factor test is employed to determine whether an antitrust plaintiff is an efficient enforcer; courts must evaluate: "(1) the directness or indirectness of the asserted injury, (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement, (3) the speculativeness of the alleged injury, and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *IQ Dental Supply, Inc.*, 924 F.3d at 65 (quoting *Daniel*, 428 F.3d at 443). "These four factors need not be given equal weight: the relative significance of each factor will depend on the circumstances of the particular case." *Id.*

Saint Francis' allegations generally fall into two categories of allegedly anticompetitive conduct: first, HHC's acquisition of physicians and physician practices and control over referrals, including through its exclusive contract to use an orthopedic surgery robot; and second, HHC's refusal to participate in tiered networking programs. The Court will apply the antitrust standing test to each category of anticompetitive conduct.

B.  Recruiting and Acquiring Physicians, Controlling Referrals, and Negotiating an
    Exclusive Technology Agreement

    1.  *Antitrust Injury*

For the reasons set forth below, the Court concludes that Saint Francis has plausibly alleged antitrust standing with respect to its first theory of anticompetitive conduct.

At the first step of the antitrust injury test, the Court identifies the practice complained of and the reasons why it might be anticompetitive.  *IQ Dental Supply, Inc.*, 924 F.3d at 62–63.  The Second Circuit has explained that the bar for alleging an anticompetitive practice at this step is low.  *Id.* at 63.

As noted above, Saint Francis alleges that HHC caused approximately thirty independent physician practices and two independent group practices to end their affiliation with Saint Francis.  FAC ¶¶ 54, 63–64.  In addition, Saint Francis alleges that HHC caused many independent physicians to end their affiliation with Saint Francis' provider network, SoNE, and become exclusively affiliated with HHC's provider network, ICP, although these physicians ostensibly remain independently practicing physicians.  *Id.* ¶ 55.  Saint Francis alleges that HHC was able to acquire so many physician practices through coercion and intimidation, for example, by threatening employee physicians with loss of referrals.  *Id.* ¶ 62.  In addition, Saint Francis alleges that HHC wields greater-than-typical control over the referrals of both independent physicians in the ICP provider network and physicians acquired and employed by HHC, such that those physicians cannot refer patient cases to any physician outside the HHC system or ICP network.  *Id.* ¶¶ 73, 78.  Saint Francis further alleges that HHC's exclusive contract to use the Mako orthopedic surgery robot for eight years gave HHC an advantage in recruiting orthopedic physicians because it could tell such physicians that they could not utilize a Mako robot unless they practiced at HHC.  *Id.* ¶ 121.

Through this activity, Saint Francis alleges, HHC has amassed so much market share that it holds significant bargaining leverage over managed care plans, who must offer HHC to their insureds because of its size and ubiquity.  The managed care plans, the argument goes, cannot refuse the higher prices HHC demands of the plans, despite that HHC's services are of lower quality than those of Saint Francis.  These allegations meet the low bar for pleading anticompetitive conduct for purposes of antitrust standing.  *See Saint Alphonsus Med. Ctr.—Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 1:12-cv-00560 (BLW), 2014 WL 407446, at *13–14 (D. Idaho Jan. 24, 2014) (recognizing that substantial market share would give a health system "dominant bargaining position over health plans," leading to increased reimbursements that the plans "will pass on to consumers in the form of higher health care premiums and higher deductibles").

At the second step of the antitrust injury test, the Court identifies the "actual injury" alleged by the plaintiff, in other words, "the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct."  *IQ Dental Supply, Inc.*, 924 F.3d at 62–63 (quoting *Gatt Commc'ns, Inc.*, 711 F.3d at 76).  Saint Francis alleges that HHC's acquisition of physician practices and control over referrals have caused Saint Francis to lose a significant number of commercially insured patients, threatening its financial health.  Saint Francis also alleges that it has incurred significant costs in recruiting additional physicians.  Defendants do not meaningfully challenge that Saint Francis has passed this step of the antitrust injury test.

At the third step, the Court "compares the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges."  *IQ Dental Supply, Inc.*, 924 F.3d at 62–63.  "It is not enough for the actual injury to be causally linked to the asserted violation. . . . Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes . . . defendants' acts

unlawful." *Gatt Commc'ns, Inc.*, 711 F.3d at 76 (quoting *Brunswick Corp.*, 429 U.S. at 489, and *Daniel*, 428 F.3d at 438). Importantly, antitrust laws protect "competition, not competitors," *Brown Shoe Co.*, 370 U.S. at 344, so a plaintiff's claim will survive only if the alleged loss stems from the "competition-*reducing* aspect or effect of the defendant's behavior," *Atl. Richfield Co.*, 495 U.S. at 344. Here, Saint Francis contends that its injury—lost patient cases and reduced ability to compete for new patients—flows from HHC's acquisition of numerous physician practices and the resulting reduction in competition.

Defendants contend, however, that there is no causal connection between their alleged unlawful conduct and Saint Francis' alleged injury because Saint Francis would have suffered from the same injury if *any* hospital system had acquired the physicians at issue. Defendants argue that Saint Francis' alleged decreased ability to compete with HHC did not occur because of the size or market share of HHC; they claim that Saint Francis lacks standing because its injuries arise simply from a loss of business to a competitor, rather than a reduction in competition. In making this argument, Defendants rely heavily on two particular cases, *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477 (1977), and *SCPH Legacy Corp. v. Palmetto Health, Practice Partners in Healthcare, Inc.*, No. 3:16-CV-2863-JFA, 2017 WL 1437329, at *3 (D.S.C. Feb. 24, 2017), *aff'd sub nom. SCPH Legacy Corp. v. Palmetto Health*, 724 F. App'x 275 (4th Cir. 2018).

In *Brunswick Corp.*, the Supreme Court held that the plaintiff, an owner of bowling alleys, lacked antitrust standing to pursue a claim against a manufacturer of bowling equipment that acquired several bowling alleys and became a competitor in the plaintiff's market. 429 U.S. at 491. The plaintiff claimed that it lost income because the competing bowling alleys would have gone bankrupt and closed if the defendant had not acquired them. *Id.* at 487. But the Court explained that such injury was not of the type the antitrust laws are meant to prevent because it

bore "no relationship to" the relative market power wielded by the defendant or the acquired bowling alleys. *Id.* Rather, the plaintiff "would have suffered the identical 'loss' but no compensable injury had the acquired [bowling alleys] instead obtained refinancing or been purchased by 'shallow pocket' parents." *Id.*

In *Palmetto Health*, a district court applied *Brunswick Corp.* to conclude that a plaintiff hospital system lacked antitrust standing to challenge a competing hospital system's acquisition of the plaintiff's orthopedic clinic. 2017 WL 1437329, at *3. Although the plaintiff alleged that it suffered from a reduced ability to compete as a result of the loss of the clinic, the court explained that, like in *Brunswick Corp.*, the plaintiff "would have suffered the same injury regardless of who acquired" the clinic. *Id.* at *4. In other words, the plaintiff's "diminished ability to compete" in the orthopedic services market occurred because of the loss of the clinic and not because of "the increased size" of the defendant hospital system. *Id.*

In arguing that the Court should follow *Brunswick Corp.* and *Palmetto Health* to find that Saint Francis would have suffered the same loss of patient cases had the physicians been acquired by any other competing hospital system, Defendants ignore the crucial feature that distinguishes this case from those: Saint Francis alleges that its injury—lost patient cases and reduced ability to compete for new patients—resulted precisely from *HHC* wielding control over its physicians' referrals and amassing an anticompetitive market share. Saint Francis has plausibly alleged that a competing hospital system without the significant market power HHC allegedly enjoys could not have caused such an injury. Specifically, as physicians leave hospitals, including Saint Francis, these hospitals become less attractive to patients of managed care plans; conversely, as HHC amasses physicians, the plans' insureds demand inclusion of HHC services in the plans, and the plans become increasingly unable to refuse whatever prices HHC demands. If the physicians

instead dispersed to a number of different hospitals, no single hospital would be able to wield the significant bargaining power over the plans that Saint Francis alleges HHC has obtained through its conduct.  Therefore, Defendants' argument that Saint Francis would suffer the same loss no matter where the physicians went fails.[6]

A related distinguishing feature of those cases is that neither plaintiff alleged facts sufficient to demonstrate that the defendants erected barriers that suppressed the plaintiffs' ability to compete, whereas Saint Francis here alleges that it loses patients in part because of the barriers created by HHC's market power, control over referrals, and leverage over insurers.  In other words, the plaintiffs in *Brunswick Corp.* and *Palmetto Health* objected to the *continued* price and quality competition that resulted from the defendants' acquisitions; here, Saint Francis objects to the *obstruction* of price and quality competition.  *See Brunswick Corp.*, 429 U.S. at 488 ("At base, [the plaintiff] complain[s] that by acquiring the failing [bowling alleys] [the defendant] preserved competition, thereby depriving [the plaintiff] of the benefits of increased concentration. . . . The antitrust laws, however, were enacted for 'the protection of competition not competitors.'" (quoting *Brown Shoe Co.*, 370 U.S. at 320)); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) (discussing *Brunswick Corp.*).

In sum, the complaint alleges that HHC increased its market share of specialist healthcare services to 60–80% by acquiring a significant number of physician practices, which

---

[6] The allegations of the complaint pertaining to the Mako orthopedic surgery robot similarly weaken Defendants' argument that Saint Francis would have suffered the same loss if any other competitor engaged in the practices HHC allegedly committed.  For example, Saint Francis alleges that HHC's large market power was what enabled it to obtain the exclusive contract to use the Mako robot, which suggests that no other competitor could have obtained similar use of the Mako robot in the first place.  FAC ¶ 119.  In addition, had HHC not had an exclusive contract and another, smaller hospital obtained a Mako robot, that smaller hospital still would not have been as attractive to the orthopedic surgeons because of its smaller patient base; the smaller patient base is caused, at least in part, by the other hospital's hampered ability to compete with HHC to be selected by insurers as an in-network provider, due to HHC's market dominance.  In other words, Saint Francis plausibly alleges that no other competing hospital system had the market power to do what HHC allegedly did with such anticompetitive effects.

anticompetitively incentivized insurers to select HHC as an in-network provider. That conduct, plus HHC's strong control over its physicians' referrals and its use of exclusive technology arrangements, effectively obstructs Saint Francis' ability to compete vigorously against it in price and quality dimensions. As a result, Saint Francis alleges that it has lost a significant number of commercially insured patient cases. Considering the market conditions, this harm "corresponds with the rationale for finding a violation of the antitrust laws in the first place," namely, the preservation of fair competition in the market. *See Gatt Commc'ns, Inc.*, 711 F.3d at 76 (quoting *Atl. Richfield Co.*, 495 U.S. at 342); *IQ Dental Supply, Inc.*, 924 F.3d at 64 (explaining that "[a]ntitrust law is concerned with market conditions"). Accordingly, Saint Francis has plausibly alleged an antitrust injury with respect to HHC's acquisition of physician practices and control of referrals.

### 2. Efficient Enforcer

The Court next turns to the second step of the antitrust standing test, which considers whether the plaintiff is an "efficient enforcer" of the antitrust laws, *see Gatt Commc'ns, Inc.*, 711 F.3d at 78, or, in other words, "whether the plaintiff is a proper party to bring a private antitrust action," *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 535 n.31. Although this step of the antitrust standing test involves a four-factor test, the Court will focus its discussion on the first two factors, to which Defendants devote their entire argument: directness and the existence of a class of other enforcers.

The first factor considers the directness or remoteness of the antitrust plaintiff's injury. "Directness in the antitrust context means close in the chain of causation." *Gatt Commc'ns, Inc.*, 711 F.3d at 78 (citation and internal quotation marks omitted). HHC's conduct acquiring independent physician practices and amassing such an immense market power is not too remote

to provide a basis for Saint Francis' antitrust claims. Notably, specialist physician services are of limited supply, so HHC recruiting physicians and curtailing their referral discretion necessarily and directly harms its competitors' ability to offer those services. Thus, the result of HHC's actions in recruiting so many physicians and keeping all their referrals within the HHC system—HHC's concentration of significant market power—flows directly from those actions. Saint Francis has also alleged that HHC's plan was to "crush" or "bury" Saint Francis. FAC ¶ 7. In other words, Saint Francis has alleged that the harm it has suffered as HHC's closest and only significant competitor, was "foreseeable" and "a necessary step in effecting the ends of" the alleged attempt to monopolize. *McCready*, 457 U.S. at 479.

The second factor considers whether there exists "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," which "diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 542. Multiple entities may be naturally motivated by self-interest to pursue an antitrust action; there need not be only one. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009). The relevant question is not whether an antitrust plaintiff is *the* entity most motivated by self-interest, but rather whether the antitrust plaintiff is *an* entity significantly enough motivated by self-interest to be an efficient enforcer of the antitrust laws. *Id.* The plaintiff's "inferiority" to another potential plaintiff can be relevant to the question of whether the plaintiff is sufficiently motivated, "but it is not dispositive." *Id.* (alteration omitted). Here, given the competition-reducing effect of HHC's conduct and the losses Saint Francis has allegedly suffered due to that conduct, Saint Francis, HHC's primary competitor in Hartford County, has a natural self-interest in prosecuting antitrust claims against it.

25

Addressing both factors, Defendants contend that Saint Francis' injury is remote because the most direct consequence of their actions alleged in the complaint—higher prices—is suffered by the insurers and insureds to whom those prices are passed on.  Thus, Defendants contend, insureds are an identifiable class of persons with a natural self-interest in antitrust enforcement, which diminishes the justification for allowing Saint Francis to maintain the present claims. Similarly, Defendants contend that the physicians allegedly coerced by HHC's conduct are an identifiable class of persons with a natural self-interest in vindicating their own claims against Defendants.

The Court is not persuaded by Defendants' arguments.  To be sure, several parties have purportedly been hurt by HHC's alleged conduct, such as the insurers who have little choice regarding whether to make HHC an in-network provider, the physicians who face significant pressure to affiliate exclusively with HHC and its provider network, and the patients who face higher insurance costs and fewer provider choices.  *See* 3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 339a (5th ed. 2020) ("In a complex economy an antitrust violation may injure many persons, each with own distinctive injury.").  But Saint Francis' alleged injury of lost patient cases, while occurring directly, compounds when considered with the injuries suffered by those other parties.  While the physicians have a natural interest in avoiding the pressure allegedly applied by HHC, Saint Francis also has a natural interest in pursuing an antitrust claim arising from that conduct because Saint Francis allegedly suffers lost patient cases and lost referrals from the loss of those physicians' services. Similarly, while the insurers have a natural interest in avoiding the leverage HHC allegedly employs against them to keep prices high during the first stage of competition, Saint Francis, too, has a natural interest in pursuing an antitrust claim arising from that conduct because HHC's

immense market power and leverage reduce Saint Francis' ability to compete at that stage of competition. Finally, while the patients have a natural interest in avoiding the alleged poorer quality of HHC's services and the higher prices that are passed on to them by the insurers, Saint Francis also has a natural interest in pursuing an antitrust claim arising from HHC's conduct in generating those prices because that conduct allegedly keeps Saint Francis from effectively participating in the second stage of competition.

In other words, Saint Francis' injury is "inextricably intertwined" with the injuries allegedly suffered by the physicians, the insurers, and the patients as a result of HHC's conduct. *McCready*, 457 U.S. at 484; *see also Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 294 (2d Cir. 1983) (holding that a programming provider had antitrust standing to challenge its competitors' boycott of its program, even though third-party program suppliers would have suffered more direct injuries, because the plaintiff's injury was "inextricably intertwined with the injury the defendants sought to inflict on" the third-party program suppliers). While Saint Francis' injury derives in part from the injuries suffered by other actors relevant to the healthcare services market, that does not necessarily render Saint Francis an inefficient enforcer. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 688 (explaining that a plaintiff had antitrust standing, "even though [the plaintiff's] injuries were derivative of the direct harm experienced by" another party). Rather, due to HHC's alleged concentration of market power, Saint Francis has suffered a direct injury, and therefore is an efficient enforcer of the antitrust laws, regardless of whether other parties also suffered injuries. Thus, Saint Francis has plausibly alleged that it has suffered an antitrust injury and that it is an efficient enforcer of the antitrust laws. Accordingly, it has antitrust standing to pursue claims arising from HHC's recruitment of physicians and control over referrals.

C.   Refusing to Participate in Tiered Networking

Saint Francis also alleges that HHC refuses to participate in tiered networking and other similar programs, in violation of the antitrust laws.  For the reasons set forth below, the Court concludes that Saint Francis has not plausibly alleged antitrust standing with respect to this theory of liability.

1.   *Antitrust Injury*

Although the bar for alleging an anticompetitive practice at the first step of the antitrust standing test is low, *IQ Dental Supply, Inc.*, 924 F.3d at 63, a plaintiff must nevertheless allege a practice that, if true, would violate antitrust laws.  *See Gatt Commc'ns, Inc.*, 711 F.3d at 77 (finding that a plaintiff lacked an antitrust injury because, in part, the alleged conduct was not prohibited by antitrust laws).  Here, Saint Francis claims that HHC and its provider network, ICP, have resisted participating in state programs that would lower costs and benefit patients, most importantly, tiered networking.  FAC ¶¶ 98, 100–01, 103, 105.  As explained above, tiered networking requires in-network hospital systems to compete to be selected by the managed care plans as preferred providers, which—according to Saint Francis—would "stimulate price competition between providers" and "significantly reduce health care costs."  *Id.* ¶¶ 105, 107 (citing studies).  Saint Francis does not, however, articulate a factual or legal theory under which HHC's refusal to participate in tiered networking programs violates antitrust law.  For example, Saint Francis points to no case, in this circuit or elsewhere, in which conduct analogous to HHC's has been found to violate antitrust law.

The second step of the antitrust injury test further illuminates why Saint Francis fails to allege an antitrust injury related to HHC's refusal to participate in tiered networking.  At this step, the Court identifies the "actual injury" alleged by the plaintiff, in other words, "the ways in which

the plaintiff claims it is in a worse position as a consequence of the defendant's conduct." *IQ Dental Supply, Inc.*, 924 F.3d at 62–63 (quoting *Gatt Commc'ns, Inc.*, 711 F.3d at 76). Saint Francis' arguments that it has alleged an injury from HHC's refusal to participate in tiered networking miss the mark. Saint Francis alleges that HHC would not be able to resist tiered networking "but for its dominant market power," FAC ¶ 115, but market power alone is no substitute for actual injury. Saint Francis also points to generally limited competition for healthcare services in the market, alleging that HHC's refusal to participate in tiered networking and similar state programs hampers the programs' intended pro-competitive effect. *Id.* ¶¶ 98, 103, 108, 110. As an initial matter, however, Saint Francis' contention that those programs are ineffective is conclusory. More importantly, Saint Francis' contention that the programs are ineffective at promoting competition in the market does not satisfy its obligation to identify the injury *Saint Francis* has suffered due to the alleged ineffectiveness of those programs. The fact that tiered networking arrangements may be better for patients and for the healthcare system as a whole, insofar as they funnel patients to lower-cost providers, does not mean Saint Francis suffers injury from HHC's failure to participate in these arrangements. Although anticompetitive effect in the market is relevant to this step of the antitrust injury test, Saint Francis, as the plaintiff advancing the antitrust claim, must also show that it "is worse off than it would be if the market were free of anticompetitive forces" resulting from HHC's conduct. *See IQ Dental Supply, Inc.*, 924 F.3d at 64. Saint Francis has not made that showing here.

Because Saint Francis has not explained how HHC's refusal to participate in tiered networking is anticompetitive at the first step of the antitrust injury test, and because Saint Francis has not identified any actual injury at the second step of the antitrust injury test, the third step, in which the Court would compare the anticompetitive effect of the conduct and the alleged injury,

is unworkable.  *See Gatt Commc'ns, Inc.*, 711 F.3d at 76 (at the third step of the antitrust injury

test, "the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended

to prevent and that flows from that which makes . . . defendants' acts unlawful" (citations and

internal quotation marks omitted)).

For these reasons, the Court cannot conclude that Saint Francis has plausibly alleged an

antitrust injury arising from HHC's refusal to participate in tiered networking.

## 2.  *Efficient Enforcer*

Even if Saint Francis had plausibly alleged an antitrust injury arising from HHC's refusal

to participate in tiered networking, however, Saint Francis clearly lacks antitrust standing because

it is not an efficient enforcer of the antitrust laws on this issue.  While Saint Francis' theory of

antitrust liability relating to physician acquisitions and referrals involves direct harm related to

harms experienced by other parties in the healthcare services market, the chain of causation with

respect to Saint Francis' theory relating to tiered networking is far more attenuated.  Saint Francis

does not allege that it has lost patients or is barred from the market as a result of HHC's refusal to

participate in tiered networking.  At most, Saint Francis essentially contends that it would be able

to gain more patients if HHC participated in tiered networking, but such contention does not

necessarily render Saint Francis an efficient enforcer of the antitrust laws in this regard.  Rather,

even if it were clear from the allegations of the complaint that tiered networking and other similar

programs are indeed ineffective, the only direct result of such ineffectiveness is the higher prices

borne by insurers and, presumably, then passed on to patients.  Those patients—and, to a lesser

extent, insurers—would be in the most natural position to seek enforcement of the antitrust laws

relating to this issue.  Saint Francis' inferior interest does not render it an efficient enforcer, given

that it cannot point to an injury, much less a direct one, arising from any anticompetitive conduct

by HHC.  Accordingly, the Court concludes that Saint Francis has not plausibly alleged antitrust standing with respect to this theory of liability.

## IV.     ANTITRUST VIOLATION THROUGH ACQUISITION OF PHYSICIAN PRACTICES

Separate from its antitrust standing arguments, Defendants contend that HHC's recruitment and employment of physicians does not qualify as anticompetitive conduct within the meaning of the antitrust laws.  Defendants argue that, as a general matter, a company's hiring of its competitor's employees does not constitute an antitrust violation because recognizing such conduct as an antitrust violation would discourage employee mobility.

Generally, "one firm's hiring of its competitor's employees does not present a 'compelling case for antitrust intervention.'" *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 n.6 (2d Cir. 1987) (quoting 3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 702b at 109 (1st ed. 1978)).  *See also Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, No. 08-CV-513 (CMA) (KMT), 2009 WL 2596493, at *12 (D. Colo. Aug. 21, 2009) ("Courts are rightly cautious in imposing antitrust liability for a firm's hiring practices.").  This is because antitrust law generally should not be construed to "constrict the freedom of employees to reap the full benefits of their abilities by discouraging them from moving to the employer offering the highest compensation." *Int'l Distrib.*

*Ctrs., Inc.*, 812 F.2d at 795 n.6.[7]

Saint Francis seeks to characterize HHC's actions not simply as employing or raiding talent, but, rather, as acquisitions that were made for the purpose of concentrating HHC's market power; thus, they claim these actions violate Section 7 of the Clayton Act and, by extension, Sections 1 and 2 of the Sherman Act. As set forth above, Section 7 of the Clayton Act prohibits the acquisition of a business' assets where the effect of such an acquisition is to substantially lessen competition. 15 U.S.C. § 18. An acquisition can be either horizontal or vertical in nature. Horizontal transactions are those between actual or potential competitors; they involve a firm "controlling an undue percentage share of the relevant market, and result[] in a significant increase in the concentration of firms in that market" that is "inherently likely to lessen competition substantially." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364 (1963). Although Saint Francis' briefing characterizes HHC's conduct as having some horizontal effects because it involves the purchase of physician practices by an entity that already owns a substantial number of physician practices, Saint Francis primarily argues that "physician acquisitions are the equivalent of vertical mergers." ECF No. 73 at 28.

A vertical acquisition merges "persons at different levels of the market structure, *e.g.*, manufacturers and distributors." *Dichello Distribs., Inc.*, 2021 WL 4170681, at *6 (quoting

---

[7] Although the Second Circuit has not expressly considered whether a defendant may violate antitrust law by hiring its rival's employees, courts in other circuits have recognized an antitrust claim for "predatory hiring," finding such conduct unlawful when the defendant hires the employee "not for its own use but only to deny it to the competitor." *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 620 (W.D. La. 2016) (citing *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 480–81 (5th Cir. 2000)). *See also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 (3d Cir. 2010) (reversing a district court's dismissal where the plaintiff alleged that the defendant hired some of the plaintiff's employees "not because it needed them but in order to injure" the plaintiff); *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) ("Unlawful predatory hiring occurs when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor."). Here, Saint Francis expressly disclaims reliance on a predatory hiring theory. Accordingly, the Court need not consider Saint Francis' halfhearted (and contradictory) alternative argument that its allegations do state a predatory hiring claim.

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012)).   Because a company's vertical expansion "will ordinarily be for the purpose of increasing its efficiency, which is a prototypical valid business purpose," vertical expansion, "without more, does not violate" the antitrust laws.  *Port Dock & Stone Corp.*, 507 F.3d at 124–25; *see also Agency Dev., Inc. v. MedAm. Ins. Co.*, 310 F. Supp. 2d 538, 544 (W.D.N.Y. 2004) ("Absent some anticompetitive effect, vertical integration does not violate antitrust laws."), *amended on reconsideration on other grounds*, 327 F. Supp. 2d 199 (W.D.N.Y. 2004).  Rather, a plaintiff must show "an actual adverse effect on competition as a whole in the relevant market."  *Dichello Distribs., Inc.*, 2021 WL 4170681, at *7 (quoting *Geneva Pharms. Tech. Corp. v. Barr Laboratories Inc.*, 386 F.3d 485, 506–07 (2d Cir. 2004)).  A plaintiff can make such a showing by demonstrating "that the defendant had sufficient market power to cause an adverse effect on competition" as a result of the vertical expansion, *id.* at *8, or that the vertical expansion increased "barriers to entry into the market" by, for example, "foreclosing competitors . . . from access on competitive terms," *Yankees Ent. & Sports Network, LLC*, 224 F. Supp. 2d at 673; *see also Port Dock & Stone Corp.*, 507 F.3d at 125 (describing the "special circumstances in which a monopolist's vertical expansion could be anticompetitive").  The plaintiff must plead facts that would show that the vertical expansion was "for an anticompetitive purpose rather than for the purpose of improving efficiency."  *Id.*

Defendants take issue with Saint Francis' characterization of the transactions as "acquisitions."  While Defendants concede that the two group practices were acquired by HHC in vertical mergers, Defendants contend that all other physician practices identified in the complaint consisted of solo practitioners who were simply *hired* by HHC.  Defendants contend that different considerations apply when an antitrust defendant does not engage in a corporate acquisition, but, rather, hires rival talent.  Thus, the question becomes whether the complaint alleges that HHC

vertically expanded or hired rival talent.  If the complaint alleges only the hiring of rival talent, it must fail.  If it instead alleges that HHC vertically expanded by acquiring the physician practices at issue, then Saint Francis must plausibly allege an adverse effect on competition, for example, by demonstrating that HHC obtained a high degree of market power that led to higher prices or erected barriers to enter the market by virtue of the vertical expansion.  *See Dichello Distribs., Inc.*, 2021 WL 4170681, at *7; *Yankees Ent. & Sports Network, LLC*, 224 F. Supp. 2d at 673. Accepting the truth of the allegations and construing all reasonable inferences in favor of Saint Francis, as proper at the motion to dismiss stage, *see Faber*, 648 F.3d at 104, the Court concludes that the complaint plausibly alleges unlawful vertical expansion by HHC, though it presents a close question.

In arguing that Saint Francis' allegations pertaining to hiring do not sufficiently state anticompetitive conduct, Defendants rely heavily on *BRFHH Shreveport, LLC v. Willis Knighton Medical Center*, 176 F. Supp. 3d 606, 620 (W.D. La. 2016), in which a district court held that a plaintiff failed to state an antitrust claim with respect to certain conduct and stated a claim with respect to other conduct.  There, the defendant hospital system had hired physicians from competing facilities, waited for the facilities to fail, and then purchased the remaining assets of the failed facilities.  *Id.* at 612.  The court held that, because the defendant did not acquire the physical assets of the targeted medical facilities before they failed, this activity was better characterized as a hiring decision than an anticompetitive acquisition, and thus could not sustain an antitrust claim. *Id.* at 621.  By contrast, the defendant's "outright takeovers" of a surgery hospital and a cardiology group practice were deemed acquisitions that could form the basis of an antitrust claim.  *Id.*  Thus,

in *Shreveport*, the key fact distinguishing an acquisition claim from a hiring claim was whether the defendant acquired not only the physician, but the practice's *physical* assets. *See id.*[8]

Here, using *Shreveport*'s test,[9] Saint Francis' allegations permit a reasonable inference that HHC typically outright took over independent physician practices, akin to the practice takeovers found to constitute acquisitions in *Shreveport*. Specifically, Saint Francis alleges that, when HHC acquired independent physician's practices, HHC would typically take over the acquired practice's lease and employ the practice's staff; in some cases, it has also acquired the practice's equipment. FAC ¶¶ 56, 61. The Court can also reasonably infer that HHC effectuated such a takeover with respect to the two cardiology group practices identified in the complaint. *See id.* ¶¶ 63–66. Whether HHC actually acquired the assets of any particular physician practice is a factual question not properly considered on a motion to dismiss.

Defendants do not appear to contest that, if Saint Francis has pleaded a vertical expansion, it has demonstrated that such expansion was for an anticompetitive purpose, rather than for the purpose of improving efficiency—at least for purposes of surviving a motion to dismiss. *See Port Dock & Stone Corp.*, 507 F.3d at 125. Of course, HHC can later present evidence that the hiring or acquiring of the physicians at issue is in fact pro-competitive, as a defense against antitrust

---

[8] Neither party in *Shreveport* characterized these transactions as vertical acquisitions. *See* 176 F. Supp. 3d at 622.

[9] The Court is not altogether certain that an acquisition must involve the transfer of *physical* assets, as *Shreveport* held. Saint Francis points to dated case law suggesting a broader view of the terms "acquisition" and "assets" in Section 7 of the Clayton Act. *See, e.g.*, *United States v. Columbia Pictures Corp.*, 189 F. Supp. 153, 182 (S.D.N.Y. 1960) ("[The Clayton Act] imposes no specific method of acquisition. It is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to give the transfer economic significance and the proscribed adverse 'effect.'"); *id.* ("As used in this statute, and depending on the factual context, 'assets' may mean anything of value."); *Mr. Frank, Inc. v. Waste Mgmt., Inc.*, 591 F. Supp. 859, 866 (N.D. Ill. 1984) (Section 7 of the Clayton Act forbids "not only direct acquisitions but also indirect acquisitions"; "[t]he economic significance of the relationship, rather than its size or form, is the relevant inquiry"); *S. Concrete Co. v. U.S. Steel Corp.*, 394 F. Supp. 362, 374 (N.D. Ga. 1975) (the "words 'acquire' and 'assets' . . . are generic, imprecise terms encompassing a broad spectrum of transactions whereby the acquiring party may accomplish the acquisition by means of purchase, assignment, lease, license, or otherwise" (quoting *Columbia Pictures Corp.*, 189 F. Supp. at 182)). Saint Francis, however, does not explicitly argue for an alternative to the *Shreveport* test. Given the Court's holding that Saint Francis' allegations survive even the *Shreveport* test, the Court need not address whether a different definition of "acquisition" or "assets" is appropriate.

liability.[10]  *See Geneva Pharms. Tech. Corp.*, 386 F.3d at 507 (explaining that, "[i]f the plaintiffs satisfy their initial burden" of demonstrating that the conduct at issue had an adverse effect on competition as a whole in the relevant market, then "the burden shifts to the defendants to offer evidence of the pro-competitive effects of" the conduct); 3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 1000 (5th ed. 2020) (explaining that, against the possible harms of a vertical merger such as increased entry barriers, "must be set the likelihood that a vertical merger will promote efficiencies or other procompetitive benefits").  At this preliminary stage of the case, Saint Francis' allegations that HHC typically acquires a practice's assets is enough to justify Saint Francis' characterization of its claim as arising from HHC's vertical acquisitions.[11]

## V.     RELEVANT MARKET

Defendants next contend that, even if Saint Francis has antitrust standing to pursue its antitrust claims, those claims should be dismissed because the complaint fails to plausibly define the relevant market.  For the reasons that follow, the Court disagrees.

---

[10] Another reason the Court is not persuaded by Defendants' argument that employee mobility is so pro-competitive as to preclude Saint Francis' antitrust claims as a matter of law is that Defendants offer no limiting principle to this argument.  If the Court were to accept Defendants' broad reading of the footnoted policy discussion in *International Distribution Centers, Inc.*, 812 F.2d at 795 n.6, every acquisition of a small corporate entity would be permissible under antitrust laws to preserve employee mobility, even if, as alleged in this case, many small transactions together increase the alleged monopolist's market power to an anticompetitive level.  Absent clearer direction from the Second Circuit, the Court will not read that case so broadly.  The Court notes, however, that its conclusion is tied to the allegations of the FAC, which the Court is bound to accept as true in considering the present motion.  If further development of the facts reveals that a significant number of the physicians were simply hired by HHC, and that their practices' assets were not acquired in the process, then Defendants may properly reiterate their argument about the pro-competitive effect of employee mobility and the weak anticompetitive effect of their conduct at a later stage of the case.
[11] Because only Section 7 of the Clayton Act requires an acquisition, and Sections 1 and 2 of the Sherman Act are worded more broadly, Saint Francis also states a claim under those latter statutes.  Section 1 of the Sherman Act only requires a combination in restraint of trade, and need not involve an acquisition.  15 U.S.C. § 1.  Section 2 broadly prohibits exclusionary conduct.  15 U.S.C. § 2.  For the reasons discussed above, Saint Francis has sufficiently pleaded anticompetitive and exclusionary conduct.

"Determination of the relevant product and geographic markets is a necessary predicate to deciding whether" a defendant's practices violate the antitrust laws. *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 618 (1974); *see also Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 375 (2d Cir. 2011) (summary order) ("When evaluating the extent to which a defendant exercises power in the alleged relevant market, that market must be properly defined."). "A relevant market has two components, product and geographic." *Smugglers Notch Homeowners' Ass'n*, 414 F. App'x at 375; *see also Concord Assocs., L.P.*, 817 F.3d at 52 (same). "Taken together, the product and geographic components illuminate the relevant market analysis, which is essential for assessing the potential harm to competition from the defendants' alleged misconduct." *Concord Assocs., L.P.*, 817 F.3d at 52 (citation and internal quotation marks omitted); *see also Fed. Trade Comm'n v. Pa. State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016) ("Without a well-defined relevant market, an examination of [a defendant's anticompetitive practices] would be without context or meaning." (citation and internal quotation marks omitted)).

With respect to both components of the relevant market, "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co.*, 370 U.S. at 336. "Because market definition is a deeply fact-intensive inquiry," courts ordinarily do not grant motions to dismiss for failure to define the relevant geographic or product market. *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (collecting cases). There is, however, no "'absolute rule' against dismissal where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way." *Concord Assocs., L.P.*, 817 F.3d at 53 (citing *Todd*, 275 F.3d at 200).

A.   Geographic Market

Beginning with the relevant geographic market, "[c]ourts generally measure a market's geographic scope, the area of effective competition, by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Id.* (citations and internal quotation marks omitted).  As the U.S. Supreme Court has explained, the geographic market must "both correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co.*, 370 U.S. at 336–37 (footnote omitted). Depending on the circumstances of the particular case, the market may encompass the entirety of the United States, or it may be "as small as a single metropolitan area." *Id.* at 337.  In sum, "[t]he relevant geographic market is that area in which a potential buyer may rationally look for the goods or services he seeks," a contextual inquiry that must "correspond to the commercial realities of the industry." *Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022) (citations and internal quotation marks omitted).

Here, Saint Francis alleges that the relevant geographic market is Hartford County.  FAC ¶ 144.  Hartford County is, according to Saint Francis, a "highly significant area to health plans." *Id.* ¶ 152.  It contains the state capital and other major employers, and it has a population of approximately 900,000 people, most of whom seek care in the area. *Id.* ¶¶ 152, 154.  Specifically, Saint Francis alleges that more than 90% of commercially insured patients in Hartford County receive hospital care in Hartford County, and that patients in Hartford County seeking cardiology and oncology care tend to seek that care close to home. *Id.* ¶¶ 144–45, 148.  These allegations plausibly support Saint Francis' contention that Hartford County is an economically significant geographic market, given the circumstances of the healthcare industry.  Although Defendants have not conceded that Hartford County is an economically significant geographic market considering

the circumstances and commercial realities of the healthcare industry, Defendants devoted no discussion to the geographic market in their briefing or at oral argument.  Accepting Saint Francis' allegations as true, the Court concludes that Saint Francis has adequately pleaded Hartford County as the relevant geographic market.

### B.  Product Market

"A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'"  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *du Pont*, 351 U.S. at 404). "[T]wo products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand.  Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product."  *Todd*, 275 F.3d at 201–02 (citations and internal quotation marks omitted).  *See also Brown Shoe Co.*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *Remington Prods., Inc. v. N. Am. Philips Corp.*, 717 F. Supp. 36, 43 (D. Conn. 1989) ("In other words, cross-elasticity means that there is another product in the market which is fungible or may act as a substitute for the product in question.").  Within the broader product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co.*, 370 U.S. at 325 (citing *du Pont*, 351 U.S. at 593–95).  The boundaries of such submarkets are defined according to the practical realities of the industry.  *Id.*

Here, Saint Francis generally defines the relevant market as adult acute inpatient healthcare services and adult professional specialist healthcare services provided to commercially insured patients in Hartford County.  FAC ¶¶ 125, 129, 134–41, 144.  Saint Francis defines several distinct

submarkets, all applicable to adult commercially insured patients in Hartford County: "general adult acute care inpatient hospital services," *id.* ¶ 125; outpatient orthopedic surgical services, *id.* ¶ 129(E); outpatient medical oncology services, *id.* ¶ 134; and outpatient cardiologist services, *id.* ¶ 135.

Defendants contend that the antitrust laws do not support Saint Francis' product market and submarkets insofar as they are limited to commercially insured patients and exclude patients insured by government programs, specifically, Medicare and Medicaid.[12] For support, Defendants cite two cases in which courts rejected antitrust plaintiffs' attempts to limit healthcare service product markets to commercially insured patients. *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597–98 (8th Cir. 2009); *Marion Healthcare LLC v. S. Ill. Healthcare*, No. 12-CV-00871-DRH-PMF, 2013 WL 4510168, at *9–10 (S.D. Ill. Aug. 26, 2013). In response, Saint Francis points to allegations explaining that reimbursement by commercial insurers for patient services provides a "margin over cost" necessary to support the "financial health" of a hospital system, whereas reimbursement by government insurers typically does not. FAC ¶ 92.

Although the parties have not identified any Second Circuit case law considering this issue, and the Court has not found any, cases from other circuits are instructive. Saint Francis' antitrust claims are premised on the theory that HHC's anticompetitive practices have excluded Saint Francis from selling healthcare services; when presented with such a theory, a court must consider the interchangeability of the buyers to whom the plaintiff could sell its services, not the interchangeability of the services from the buyers' perspective. *See Little Rock Cardiology Clinic*

---

[12] The FAC also refers to patients insured by Medicare Advantage, a program that is distinct from both commercial insurance and traditional government insurance like Medicare and Medicaid. *See* FAC ¶ 142. For the sake of simplicity, and because Defendants do not raise any particular arguments applicable to patients insured by Medicare Advantage, the Court focuses its discussion below on the distinction between patients insured by private commercial insurance and patients insured by traditional government insurance, not Medicare Advantage.

*PA*, 591 F.3d at 597; *Stop & Shop Supermkt. Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004).  Absent allegations to the contrary, courts typically presume that all buyers to whom the plaintiff might sell its services are reasonably interchangeable as contemplated by the U.S. Supreme Court in *Brown Shoe Co.*, 370 U.S. at 325.  *See Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 1:13-CV-01054 (SLD) (JEH), 2015 WL 1399229, at *6 (C.D. Ill. Mar. 25, 2015); *Stop & Shop Supermkt. Co.*, 373 F.3d at 67.  In *Little Rock*, the court employed this reasoning to conclude that patients whose services are reimbursed through commercial insurance are, from the healthcare provider's perspective, reasonably interchangeable with patients whose services are reimbursed through government insurance.  *Little Rock Cardiology Clinic PA*, 591 F.3d 597 ("Patients able to pay their medical bill, regardless of the method of payment, are reasonably interchangeable from the cardiologist's perspective—the correct perspective from which to analyze the issue in this case.").

As noted, however, "market definition is a deeply fact-intensive inquiry," *Todd*, 275 F.3d at 199, and courts must employ "a pragmatic, factual approach" to define the relevant product market, *Brown Shoe Co.*, 370 U.S. at 336.  To that end, the boundaries of a submarket may be determined by examining "practical indicia," such as "industry or public recognition of the submarket as a separate economic entity," the submarket subject's "peculiar characteristics and uses," "distinct prices," and "specialized vendors," among others.  *Id.* at 325.

Thus, there may be circumstances when certain buyers are properly excluded from the relevant product market, creating a submarket of buyers.  *Stop & Shop Supermkt. Co.*, 373 F.3d at 67 ("Conceivably, . . . there might be some special circumstance that made separate consideration of the sub-group [of buyers] appropriate."); *Fed. Trade Comm'n v. Sanford Health, Sanford Bismarck*, No. 1:17-CV-133, 2017 WL 10810016, at *10 (D.N.D. Dec. 15, 2017) (citing *Fed.*

*Trade Comm'n v. Advocate Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016), for the proposition that "[a] relevant product market definition may be based on a distinct category of customers"), *aff'd sub nom. Fed. Trade Comm'n v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019). "For example, where the loss of high-profit sales unusually impairs the [excluded plaintiff's] survivability . . . or where there is an inelastic difference in price between sales of a single product to a particular group of customers and sales of that same product to other customers," the relevant product market may be properly limited to a sub-group of buyers. *Methodist Health Servs. Corp.*, 2015 WL 1399229, at *6.

The Court concludes that Saint Francis has identified two circumstances that justify limiting the relevant product market to commercially insured patients.  First, as noted above, the first stage of competition among healthcare providers and hospital systems is to be selected by commercial insurers as in-network providers.  This stage of the competition among hospital systems is critical because it is the stage at which HHC allegedly leverages its dominant market power to be selected by insurers as an in-network provider despite its higher costs and lower quality services.  This effectively neutralizes any competitive edge Saint Francis or any other competitor could hone by lowering costs or offering higher quality services.  The process for healthcare providers and hospital systems to contract with government insurers, however, does not involve this stage of competition.  As Saint Francis alleges, individual providers have no ability to negotiate the fees that government insurers pay them; by contrast, providers negotiate the rates that commercial insurance companies pay, and ordinarily charge commercially insured patients substantially more than they charge Medicare or Medicaid patients.  FAC ¶ 143.  At least one district court limited a product market to commercially insured patients on the ground that contracting with government insurers does not involve this stage of competition.  *Sanford Health*,

2017 WL 10810016, at *10.  Similarly, here there is a material difference in Saint Francis' ability to contract for reimbursement for services provided to commercially insured patients and services provided to government insured patients.  Accepting Saint Francis' allegations as true, it is proper to limit the relevant product market to commercially insured patients.

Second, Saint Francis has alleged that commercially insured patient cases are essential to the financial sustainability of a hospital system because, unlike government insurance, commercial insurance reimburses for healthcare services at a certain margin over cost.  At least one district court has found that this special circumstance justifies limiting a product market to commercially insured patients.  *See Methodist Health Servs. Corp.*, 2015 WL 1399229, at *7 (finding product market limited to commercially insured patients permissible where the plaintiff alleged that "access to privately-insured patients is critical to a healthcare provider's long-term sustainability in light of the comparatively low prices providers are required to charge patients covered by government plans for the same services").  The court reasoned that, from the perspective of the hospital system, the sale of healthcare services to commercially insured patients was not necessarily interchangeable with the sale of healthcare services to government insured patients.  *Id.  See also Brown Shoe Co.*, 370 U.S. at 325 (noting that "distinct prices" can inform the boundaries of a submarket).  The Court finds the reasoning of *Methodist Health Services* analogous to the present case, given that Saint Francis has also plausibly alleged that it relies on commercially

insured patient cases for its financial sustainability.[13]

Although Saint Francis will later need to substantiate its allegations, the Court accepts the truth of the allegations at the motion to dismiss stage and finds them sufficient to justify limiting the relevant product market to commercially insured patients. Thus, Defendants' request for dismissal on the ground that Saint Francis failed to plausibly define the relevant market is denied.

## VI. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

Defendants also seek dismissal of Count Nine, Saint Francis' state law claim for tortious interference with business relations. For the reasons that follow, the Court concludes that Saint Francis has plausibly alleged tortious interference with business relations.

### A. Legal Standard

To raise a claim for tortious interference with business relations, a plaintiff must plausibly allege: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000). Relevant to the second element, a plaintiff must plausibly allege that the defendant's interference was tortious. *Kopperl v. Bain*, 23 F. Supp. 3d 97, 110 (D. Conn. 2014) (citing *Robert S. Weiss & Assocs. v. Wiederlight*, 208 Conn. 525, 535–36 (1988), for the proposition that "only a tortious interference is actionable"). This requirement may be satisfied

---

[13] The present case is distinguishable from *Little Rock* and its progeny, *Marion Healthcare*. Specifically, the Eighth Circuit based its conclusion on the plaintiff's "legal theory," not its "factual allegations," suggesting that there could be no factual circumstances that might warrant defining a submarket of health services provided to only commercially insured patients. *Little Rock Cardiology Clinic PA*, 591 F.3d at 597. The Court is not persuaded by the Eighth Circuit's reasoning, however, given that the U.S. Supreme Court has emphasized the fact-specific nature of the market definition inquiry and listed considerations relevant to defining a submarket. *See Brown Shoe Co.*, 370 U.S. at 336; *see also Remington Prods., Inc.*, 717 F. Supp. at 43 ("A pronouncement as to market distinction is not one of law but of fact." (citation and internal quotation marks omitted)). Because the Eighth Circuit categorized the issue as a legal one and not a factual one, or perhaps because it read the allegations of the complaint at issue there to suggest that both commercially insured patients and patients with government insurance would pay the same amount for healthcare services, *Little Rock* and its progeny are distinguishable.

by allegations that "the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." *Laura Laaman & Assocs., LLC v. Davis*, No. 3:16-CV-00594 (MPS), 2017 WL 5711393, at *10 (D. Conn. Nov. 27, 2017) (quoting *Robert S. Weiss & Assocs.*, 208 Conn. at 536). In other words, a claim for tortious interference with business relations requires "some improper motive or improper means" that is "wrongful by some measure beyond the fact of the interference itself." *Robert S. Weiss & Assocs.*, 208 Conn. at 536 (citations and internal quotation marks omitted). Legitimate competition, however, is generally not improper or otherwise tortious interference. *See Lombardo v. R.L. Young, Inc.*, No. 3:18-CV-188 (JBA), 2020 WL 3104910, at *17 (D. Conn. June 11, 2020).

      B.  <u>Discussion</u>

Here, Saint Francis alleges that it had business relationships with the physicians and physician practices that were formerly employed by Saint Francis, practiced at Saint Francis, or were part of the SoNE provider network, as well as the patients of those physicians and practices. FAC ¶ 248. Saint Francis further alleges that HHC intentionally interfered with those relationships by intimidating the physicians, coercing the physicians and the patients, and leveraging its dominant market power, causing Saint Francis to lose those patient cases. *Id.* ¶¶ 249–50. Saint Francis provides various examples when HHC coerced individual physicians to end their affiliation with Saint Francis or SoNE and stop referring patients to Saint Francis' physicians. *See id.* ¶¶ 62, 69, 78, 82–83.

The Court finds these allegations sufficient to state a claim for tortious interference with business relations due to coercion and intimidation. Accepting those allegations as true, HHC was able to recruit at least some physicians and keep some of their referrals in-house by threatening to leverage their market power against those physicians if they did not comply with HHC's demands.

45

In addition, the allegations supporting Saint Francis' antitrust claims permit a reasonable inference that HHC's actions recruiting those physicians and insisting that they keep their referrals in-house were not motivated by legitimate competition, but rather by unlawful anticompetitive intent.

In arguing that the complaint fails to state a claim for tortious interference with business relations, Defendants contend that the allegations are conclusory and insufficient to identify any tortious conduct. Defendants' argument, however, is itself conclusory. Rather, upon reviewing cases in which courts have found allegations too conclusory and speculative to state a claim of tortious interference, the Court finds the allegations of the present complaint distinguishable. Specifically, the plaintiffs in those cases urged the courts to infer from factually sparse allegations the kind of improper conduct, intimidation, or coercion that Saint Francis expressly alleges here. *See Vanguard Dealer Servs., LLC v. Bottom Line Driven, LLC*, No. 3:21-CV-659 (SALM), 2022 WL 356751, at *6 (D. Conn. Feb. 7, 2022) (finding insufficient to state a tortious interference claim the plaintiff's allegation that the defendant "must have" engaged in tortious interference); *Nuclear Mgmt. Corp. v. Combustion Eng'g, Inc.*, No. 3:94-CV-403 (WWE), 1997 WL 43099, at *4 (D. Conn. Jan. 22, 1997) (rejecting the plaintiff's argument that intimidation can be inferred from allegations that were otherwise insufficient to state a tortious interference claim).

Moreover, Defendants do not dispute that Saint Francis has plausibly alleged the first element of a tortious interference claim (that Saint Francis had business relationships with the physicians and patients at issue) or the third element (that Saint Francis suffered loss as a result of HHC's interference). Thus, the Court concludes that Saint Francis has stated a plausible claim for tortious interference with business relations, and Defendants' motion to dismiss is denied with respect to Count Nine.

## VII.    CONCLUSION

For the reasons described above, Defendants' motion to dismiss, ECF No. 42, is GRANTED IN PART and DENIED IN PART.  Specifically, the motion is granted to the extent Plaintiff claims that Defendants violated antitrust law by refusing to participate in tiered networking and other similar programs.  The motion is denied in all other respects.  Given the limited scope of the claim dismissed, Plaintiff need not file an amended complaint.


**SO ORDERED** at Hartford, Connecticut, this 13th day of February, 2023.


 /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE